DOCUMENT FOR PUBLICE RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Chugach Federal Solutions, Inc. | ) | ASBCA No. 61320 |
| | ) | |
| Under Contract No. N44255-14-D-9000 | ) | |

APPEARANCES FOR THE APPELLANT:  Richard B. O'Keeffe, Jr., Esq.
William A. Roberts III, Esq.
Gary S. Ward, Esq.
Cara L. Lasley, Esq.
 Wiley Rein LLP
 Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Craig D. Jensen, Esq.
 Navy Chief Trial Attorney
David M. Marquez, Esq.
Robyn L. Hamady, Esq.
Anthony Hicks, Esq.
 Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

In 2011, the Naval Facilities Engineering Systems Command (NAVFAC, Navy, or government) issued a solicitation for the West Sound base services operating contract. The solicitation was for a firm-fixed-priced, performance based, Indefinite Delivery Indefinite Quantity contract to provide base operations support, such as fire and emergency services, garbage collection and building maintenance, at Naval Facilities in the Puget Sound, Washington area. The solicitation was intended to be a follow-on contract to the existing base operations support contract. However, the solicitation differed from the existing contract in at least one key detail: the existing contract procured a set number of "trouble calls," basically unscheduled building maintenance issues, while the solicitation provided that the contractor would be responsible for an unlimited number of trouble calls.

As part of the solicitation process, the government prepared an independent government estimate (IGE) of the cost of performing the contract. The IGE was generated by government employees based on data from the incumbent contractor, and the government estimators' subjective, and typically conservative, projections of the cost of performing a contract with unlimited trouble calls. The solicitation provided most, but not all, of the incumbent contractor's relevant data to the offerors. Chugach Federal Solutions, Inc. (Chugach or CFSI) was one of nine offerors responding to the

solicitation.  Despite being a firm-fixed-price level of effort contract, the solicitation requested that offerors provide staffing levels in their proposals.  The government evaluated the proposals through a technical team and a price team, which in turn reported to a source selection committee.  The technical team concluded that eight of the nine offerors, including Chugach, had a major weakness in their proposed staffing levels.  The government determined that the offerors should be prompted to review the performance work statement to ensure that they were including sufficient staffing to deal with the change to unlimited trouble calls.  In addition, the government determined that it should review the accuracy of its own IGE.

The government entered into negotiations with the offerors and asked Chugach to review its proposal to ensure that it accounted for the change to unlimited service calls.  At the same time, the government noted that specific portions of Chugach's proposal had prices that were either too high or too low, relative to the remaining offerors.  Following proposal revisions, the government awarded the contract to Chugach in March of 2014.  During the transition period, Chugach recognized that it had proposed inadequate staffing, and significantly increased its number of full time equivalent employees before beginning full performance of the contact in October 2014.  Even with the increased staffing, Chugach experienced problems meeting the contract's performance standards.  The government noted deficiencies in Chugach's performance ratings and began withholding contract funds.  In response, Chugach increased its staffing, causing financial losses on the contract.

In August 2016, Chugach submitted a certified claim seeking in excess of $12 million in increased costs pursuant to a variety of theories.  According to Chugach, the government engaged in negligent negotiations because the government failed to inform Chugach that the government had determined that Chugach was not proposing enough staff to perform the contract.  Alternatively, Chugach contends that the government had superior knowledge regarding the staffing necessary to perform the contract that it did not share with Chugach.  Chugach also contends that the parties were mutually mistaken regarding the staffing required to perform the contract, that there was a constructive change to the contract, and that the government improperly withheld payments.

The matter is before the Board pursuant to Board Rule 11, "Submission Without a Hearing," permitting the Board to make findings of fact based on the evidentiary record.  Based on the record before us, we find that Chugach has not produced evidence sufficient to support its theories of negligent negotiation, superior knowledge, mutual mistake, or constructive change.  With regard to the improper withholding count, we find that the government did not support its decision to withhold contract funds.  We grant Chugach's appeal only with regard to its challenge to the Navy's fixed percentage withholding.

DOCUMENT FOR PUBLICE RELEASE.  The decision issued on the date below is subject to an ASBCA Protective Order.  This version has been approved for public release.

FINDINGS OF FACT

I.  The Parties

At the time of the relevant events, appellant, Chugach Federal Solutions, Inc. was a subsidiary of Chugach Government Solutions, Inc. (CGS), which was, in turn, a subsidiary of Chugach Alaska Corporation (CAC) (gov't proposed finding of fact ¶ 2; compl. ¶ 1).  CAC was an Alaska Native Corporation created under the Alaska Native Claims Settlement Act of 1971 (gov't proposed finding of fact ¶ 2; compl. ¶ 1). Chugach specializes in base operations support, logistics, public works, construction, and IT services (R4, tab 4-1 at CFSI21902_7).

II.  The Solicitation

A.  Background

On November 21, 2011, NAVFAC issued Solicitation N44255-10-R-5016 (WSBOS solicitation) for the West Sound Base Operations Support Contract (WSBOS contract), a firm-fixed-priced, performance based, Indefinite Delivery Indefinite Quantity (IDIQ) contract to provide base operations services at NAVFAC facilities in the Puget Sound, Washington area, including Naval Base Kitsap (Bremerton, Bangor, and Keyport) and Naval Magazine Indian Island (R4, tab 1-1.1 at GOV1-2; R4, tab 1-1.4 at GOV363-65; compl. ¶10).  The WSBOS contract was intended to follow Contract No. N44255-05-D-5103 (EJB Contract), the expiring base operations services contract then being performed by EJB Facilities Services (EJB) (app. supp. R4, tab 60).  The WSBOS solicitation anticipated an award based on competitive acquisition, incorporating by reference Federal Acquisition Regulation (FAR) 52.215-1 (R4, tab 1-18 at GOV18373).

B.  Evaluation Criteria

The WSBOS solicitation provided for a price evaluation factor with no subfactors and a non-price evaluation factor with six subfactors (R4, tab 1-18 at GOV18378-91).  The solicitation provided that the non-price subfactors are approximately equal to each other and the six non-price factors combined are approximately equal to the total price for evaluation (*id*. at GOV18379).  In addition, Section M, Evaluation Factors for Award, Paragraph 3.a., Price, states in relevant part:

(2) Basis of Evaluation:

(a) . . . Analysis will be performed by one or more of the following techniques to ensure a fair and reasonable price:

(i) Comparison of proposed prices received in response to the RFP.
(ii) Comparison of proposed prices with the IGE.
(iii) Comparison of proposed prices with available historical information.
(iv) Comparison of market survey results.
(v) Comparison with any other data source which assists in validating the price as fair and reasonable.

(*Id*. at GOV18381)

The solicitation also includes Section M, Evaluation Factors for Award, Paragraph 3.b.(2), Factor 2, Technical Approach/Method, which states in relevant part:

2) Provide a completed Attachment J.M-5, Full Time Equivalent (FTE) Worksheet.  Provide the annual hours, and FTEs proposed for performing each element of the contract as specified in the FTE worksheet.
. . .
(b) Basis of Evaluation: Factor 2 will be evaluated as an overall factor with no subfactors.  The Government will evaluate the offeror's technical approach for adequate staffing levels and that the staffing plan offers a reasonable understanding of the requirements, labor quantities, and skills needed to successfully perform and meet the contract performance standards and objectives.

(*Id*. at GOV18384)

C.  The Performance Work Statement (PWS)

The Solicitation's Performance Work Statement (PWS) provides that:

All terms and conditions of the contract award, performance work statement, and all attachments are applicable.  The proposal presented by the offeror to whom the award is made will be incorporated, in whole or in part, into the contract at time of award.  If the Contractor's

> proposal contains terms or conditions more favorable to the Government, these more favorable terms and conditions shall be performed.  However, the minimum requirements of the performance work statement must be met.

(*Id*. at GOV18303)  The PWS similarly states that "[t]he Contractor warrants that its proposal incorporated herein by reference will meet or exceed the performance objectives set forth in this contract" (R4, tab 1-14.2 at GOV17269).

The PWS is organized into annexes.  Section J of the PWS includes multiple attachments providing more than 9,000 pages of historical data reflecting EJB's performance of the EJB Contract, inventory and equipment lists, and other information relevant to the WSBOS contract (R4, tab 1-12.5 at GOV14595 et seq.; R4, tabs 4-4 through 4-8).  In addition to the information in Section J, there was a NAVFAC technical library, which was made available to all the prospective offerors (R4, tab 1-18 at GOV18369).  There is no evidence, however, that CFSI ever used the resources available through the technical library (R4, tab 5-1 at 80; R4, tab 5-8 at 77-79).

1.  Trouble Calls

Annex 0100000, General Information, Specification Item 1.5, Verification of Workload and Conditions, states in relevant part, in relation to the information contained in Section J:

> Any historical workload data provided is from the most recent contract which differs significantly in both specification and liability limit from this contract.  These workload quantities are for illustration purposes only and represent the types and mix of the various tasks required for the performance of the previous contract.  This data is not intended to be all inclusive of the requirements for this contract or as limit for future workload.  The Contractor shall be responsible to determine the required workload to meet the specifications of this contract.  *The Contractor shall perform all required repairs below the stated liability limits, regardless of the volume of work, with no additional cost to the Government*.

(R4, tab 1-14.2 at GOV17267 (emphasis added))

Annex 0100000, General Information, Specification Item 1.11, Technical Proposal Certification, states:  "The Contractor warrants that its proposal incorporated

5

herein by reference will meet or exceed the performance objectives set forth in this contract" (*id*. at  GOV17269).

Also relevant to this appeal is Annex 1502000 (and a similar Annex 1502010 applicable to the Bureau of Medicine and Surgery (BUMED) Naval Hospital Bremerton) Facility Investment.  The scope of work in the annex generally includes "infrastructure sustainment," the maintenance and repair necessary to keep facilities in "good working order." (*Id*. at GOV17350, GOV17411)  The Recurring Work for Facility Investment is generally broken down into four categories: Spec Item 3.1 Trouble Calls, Spec Item 3.2 Maintenance, Spec Item 3.3 Inspection, Testing and Certification, and Spec Item 3.4 Other Recurring Services (*id*. at GOV17347-49). Annex 1502000, Facility Investment, Spec Item 3.1, Trouble Calls, requires the Contractor to perform "work identified at a point in time that is necessary to return a facility, structure, or piece of equipment to its intended use" (R4, tab 1-14.2 at GOV17357-59; R4, tab 1-12.7 at GOV14824).  Examples of service calls would include repairing a non-functioning HVAC unit, replacing lamps in light fixtures, and unclogging drains (R4, tab 1-12.7 at GOV14824).  The WSBOS Contract describes "trouble calls" as follows:

> Trouble Calls are classified as emergency or service work requests.  Trouble calls are called into the work reception center by building occupants or generated by designated Government or Contractor representatives; are brief in scope; and do not reasonably require detailed job planning. Multiple maintenance, repair, and minor construction requirements received for the same trade in the same building or structure at the same time will be combined into one trouble call as long as the trouble call threshold is not exceeded.

(R4, tab 1-12.5 at GOV14599)

Under the EJB Contract, EJB would perform what were referred to as "service calls" (app. supp. R4, tab 61 at CSUP2245) that were roughly equivalent to trouble calls in the new contract.  Under the EJB Contract, service calls were classified as routine, urgent, or emergency calls (app. supp. R4, tab 61 at CSUP2247-49).  Routine calls were required to be completed within 60 calendar days, urgent calls within 15 calendar days, and emergency calls within 1 hour with work continuing until the emergency has been arrested (*id*. at CSUP2247-48).  Under the EJB Contract, service calls had a maximum financial liability for the contractor of either $2,000 or $5,000 for the direct cost of labor and materials *(id*. at CSUP2245, CSUP2247-49).  In the solicitation, the dollar limit per call was $5,000 of direct labor and direct material per occurrence (R4, tab 1-14.2 at GOV17358).  The government highlighted this change

6

during the solicitation process  (R4, tab 1-19 at GOV18405, GOV18436; R4, tab 6-120 at CFSI 256231_43-44).  In addition, the new contract required all non-emergency trouble calls to be resolved within 30 calendar days (R4, tab 1-14.2 at GOV17359).

Historical trouble call data was provided in an attachment.  This information provided offerors with guidance regarding the type and mix of work to expect under this requirement.  Specifically, J-1502000-06 contained 1,972 pages of historical data regarding service calls performed by EJB from FY09 through FY11, representing years 4 through 6 of EJB's performance (R4, tab 4-6 at CFSI8949_2-1973).  Chugach calls attention to two specific service calls where it contends that the government withheld material information:  No. 3453054, where EJB incurred $2,126.30 in material costs, plus 12 labor hours, on a call with a $2,000 limit; and No. 3221559 where EJB incurred $3,242.74 in subcontractor costs, again in excess of the $2,000 limit (app. br. at 23 (citing app. supp. R4, tab 103.02 [native])).  Chugach additionally notes that of the 24,027 service calls and bullets in the November 2009 report, 22.67% were performed late (id. at 23-24); and that the records show that EJB repaired equipment that did not have an equipment number, meaning that EJB was not responsible for maintaining the equipment (id. at 24).  Dale Hrenko, a NAVFAC engineering technician, compiled the historical data based on reports from EJB; the data originated from EJB's computerized maintenance management system, known as "Maximo" (gov't ex. 2 ¶¶ 5, 11-13).  The data provided to offerors included the description, work type (routine, urgent, or emergency), the dollar threshold, location of the work, and the labor hours expended (R4, tab 4-6 at CFSI18949_2-1973).  However, the government did not provide other information to offerors, such as the date of the service request, the target and actual completion dates, and who requested the work (app. supp. R4, tab 103.02 [native]).  The service call historical data indicated there was variability year-over year in the quantity of trouble calls, ranging from approximately 21,000 to 25,000 trouble calls, on which EJB expended between approximately 70,000 and 88,000 labor hours (gov't ex. 4 ¶ 36).

During EJB's performance of the contract, the Navy's demand for service calls in some years exceeded the contractual number of calls.  In these instances, the Navy attempted to purchase additional service calls at a contractually pre-priced rate.  (Gov't ex. 3 ¶ 4)  However, some users "metered" or restricted their use of service calls to avoid incurring additional costs (app. ex. 1 at 108-09; gov't ex. 1 ¶ 21).  Chugach further contends that the Navy directed EJB not to "self-generate" service calls, implying that EBJ was not to identify items needing to be repaired (app. supp. R4, tab 143.01 at CSUP5028; tab 126 at CSUP4982); however, it is unclear whether the dispute was regarding self-generated repairs, or if the Navy was concerned that EJB was attempting to classify maintenance work as repair work (app. supp. R4, tab 143.01 at CSUP5027).

2.  Maintenance

In addition to trouble calls, the WSBOS Solicitation required the contractor to perform maintenance on identified systems and equipment.  Specifically, the contractor was required to "develop and implement a maintenance program . . . to ensure proper operation, to minimize breakdowns, and to maximize useful life" (R4, tab 1-14.2 at GOV17363).  The performance standard required that "[m]aintenance is accomplished in accordance with the Contractor's maintenance program plan and work schedule" (*id*.; gov't ex. 1 ¶ 18).  Thus, the contractor had flexibility to develop a work plan that would minimize its costs.  Equipment lists were provided for all of the categories of equipment that the contractor was required to include in the maintenance program (*see, e.g.*, R4, tab 1-14.2 at GOV17365 (referring to the galley equipment list at R4, tab 1-12.7 at GOV14880)).  While performing the scheduled maintenance per the contractor's own maintenance plan, the contractor was also required to perform any "incidental repairs, including replacement, discovered during schedule maintenance up to $500 per occurrence . . . . Incidental repairs performed under maintenance are not considered a Trouble Call, but part of the scheduled maintenance service" (R4, tab 1-14.2 at GOV17362).  This liability limit was also a change from the lower $250 liability limit for the EJB contract (app. supp. R4, tab 1 at CSUP317).  The solicitation also required the contractor to add up to an additional 250 pieces of equipment to the maintenance program each year, at a liability limit of $1,500 of direct labor and direct material per piece of equipment (R4, tab 1-14.2 at GOV17362).

In addition to the maintenance program where the contractor was to propose an "economical approach" for maintenance, the contractor was also required to maintain other categories of equipment according to "prescriptive maintenance," where the maintenance frequencies and tasks are dictated by regulation from federal, state, or local governing agencies (R4, tab 1-14.2 at GOV17371; R4, tab 1-12.7 at GOV14822).

An additional task not contained in the EJB contract, was to develop an integrated maintenance plan encompassing both maintenance and repair for specific categories of equipment (R4, tab 1-14.2 at GOV17378; R4, tab 5-6 at 142-43) rather than a set schedule of maintenance tasks, as was the case under the EJB contract (R4, tab 6-73 at CFSI115660_1; R4, tab 5-6 at 142-43).  The RFP also provided that for equipment and systems subject to an IMP "the Contractor has full responsibility for any individual occurrence of repair, including replacement, up to and including $10,000 in direct material and/or direct labor cost for each piece of equipment per incident unless stated otherwise for specific equipment or systems" (R4, tab 1-14.2 at GOV17435).

8

D.  Maximo Data

Annex 0200000, Management and Administration, Specification Item 2.6.7, Computerized Maintenance Management Systems (CMMS), requires the contractor to maintain a CMMS to manage all service operations and performance data (R4, tab 1-14.2 at GOV17287-88).  Maximo is a commercial software application that is known as a "Computerized Maintenance Management System" or "CMMS" (*see* R4, tab 5-10 at 111).  Although both the government and EJB used Maximo during EJB's performance of the EJB Contract, the government's Maximo database and the EJB Maximo database were separate databases (app. supp. R4, tab 61 at CSUP2149; R4, tab 10-1 ¶ 133).  EJB was contractually required to enter certain types of information into the government's Maximo database, however, it maintained even more detailed information in its own database.  *See EJB Facilities Servs.*, ASBCA No. 57112, 15-1 BCA ¶ 35,867, at 175,358; R4, tab 10-1 ¶ 133.

Prior to award of the WSBOS contract, CFSI reviewed the solicitations for both the EJB contract and the WSBOS contract, both of which described the types of information entered into the government's Maximo database (R4, tab 5-10 at 113-14).  In addition, the government made the EJB contract available for review by prospective offerors (R4, tab 1-19 at GOV18392).  Chugach itself previously used Maximo on at least two base operation services contracts with the Navy—the Whidbey Island (also called North Sound) and Fallon contracts (R4, tab 5-10 at 111-12).  Chugach understood that Maximo includes functions for scheduling, inventory management, property management, material management and contains work plans and performance data, including the hours craftsmen spend on a work order (*id*. at 113).

E.  The Pre-Proposal Conference and Site Visit

On December 12-13, 2011, the government held a pre-proposal conference and site visit, which Mr. Hammock and Mr. Watts, members of Chugach's proposal team, as well as Matt Hayes (one of Chugach's subsidiary presidents) attended (R4, tab 6-119; R4, tab 6-120; R4, tab 5-3 at 59-60, 71-72).  At the Pre-Proposal Conference and Site Visit, the government described some of the differences between the EJB contract and the WSBOS contract, including the new IMP requirement and the changes in trouble call liability limits and completion times (R4, tab 6-120 at CFSI1256231_29-35; gov't ex. 5 at GOV1059689, GOV1059696-98).  During a presentation at the Pre-Proposal Conference and Site Visit, David Williams, NAVFAC's Facility Support Contract Program Manager, informed prospective offerors that, compared with the EJB Contract, "[t]he service call approach, or trouble calls is different in [the WSBOS contract]" (R4, tab 6-120 at CFSI256231_30).  Mr. Williams informed offerors that "a key difference" between the EJB contract and the WSBOS contract is that the government changed "all our various size trouble calls to one size, with a maximum $5,000 liability limit per trouble call."  He notified offerors that the "old data is based

on two different [trouble call] sizes, $2,000 limit trouble call, and a $5,000 size." (*Id*. at CFSI256231_44)  Mr. Williams also informed the prospective offerors that another major change from the EJB contract was that "[t]his solicitation includes something that we haven't utilized here in the Northwest, and it's [an] integrated maintenance program, or an integrated maintenance program approach" (*id*. at CFSI256231_30).

F.  The Independent Government Estimate

As part of the source selection process, the government developed an IGE that was used to facilitate its planning and budgeting for the WSBOS contract, and was intended to be available as a tool to evaluate proposals (gov't ex. 2 ¶ 15; gov't ex. 1 ¶ 10; app. ex. 1 at 143; R4, tab 1-18 at GOV18381).

At issue in this appeal is the IGE pertaining to trouble calls under the facility investment annex.  Mr. Hrenko, was primarily responsible for developing the IGE for Annex 1502000, the "Facility Investment" work which includes maintenance and repair of facilities (gov't ex. 2 ¶ 14).  For some lines of the IGE for 1502000, including the trouble call lines, Mr. Hrenko used information from EJB's historical performance, and, based on his own judgment, adjusted for the projected impacts of the differences between the EJB Contract and the WSBOS solicitation (*id*.; app. ex. 3 at 117-18).  As discussed in more detail below, Mr. Hrenko used certain of EJB's historical performance data that was not provided to offerors in the solicitation.  In his preparation of the IGE for Annex 1502000 trouble calls, Mr. Hrenko utilized a total quantity of 19,395 trouble calls under ELIN 15AF and 3,153 IMP repairs under ELIN 15AG, for a total quantity of 22,548 trouble calls and IMP repairs (gov't ex. 2 ¶ 16).  The data he provided for WSBOS solicitation attachment J-1502000-06 lists FY09– FY11 trouble calls from the EJB contract (*id*.).  For his estimate of trouble calls (TC) in the IGE, Mr. Hrenko used the following factors: Emergency non-BEQ (Bachelor Enlisted Quarters or bachelor housing) at 4.8 hrs/TC, Emergency BEQ at 3.8 hrs/TC, Service non-BEQ at 6.6 hrs/TC, and Service BEQ at 5.0 hrs/TC (*id*. ¶ 17).

In preparing his estimate, Mr. Hrenko estimated how the changes to the requirements could impact the contractor's effort related to trouble calls and IMP repairs (*id*.).  Mr. Hrenko estimated that all types of trouble calls would require a higher number of hours than historical values based on this assumed impact (*id*.).  As noted above, in developing the Annex 1502000 IGE for trouble calls, Mr. Hrenko estimated that each nonemergency, non-BEQ trouble call would require an average of 6.6 labor hours (i.e., approximately double the average under the incumbent EJB Contract) because he assumed that the increase in liability limits (from a mix of $2,000 and $5,000 to only $5,000) from the EJB contract to the new WSBOS contract would mean that the contractor would spend an increased amount of time performing trouble calls (because the contractor would be responsible for a greater amount of cost before

liability shifted to the government) (gov't ex. 2 ¶ 18).[1] The 6.6-hour factor was Mr. Hrenko's projection as to what would, on average, be required to perform these non-emergency calls given the increase in liability limit (*id*.). This estimation of 6.6 hours per trouble call was higher than EJB's weighted average hours per trouble call and higher than the average hours per trouble call that Mr. Hrenko had used in negotiating changes with EJB on its contract (*id*.). In fact, Chugach's experience in performing the contract was substantially below 6.6 labor hours per service call (R4, tab 10-1 ¶ 117).

Mr. Hrenko estimated the future quantity of trouble calls under the WSBOS contract by adjusting the historical quantities of service calls based on his personal judgment (*id*. ¶ 21). For estimating the cost of materials associated with Annex 1502000, Mr. Hrenko used his personal judgment to estimate that materials would generally be 30% of the direct labor cost (*id*. ¶ 23). He applied the 30% to trouble call repairs, IMP repairs, and the facilities manager and data entry clerk (*id*.). Mr. Hrenko also applied the material cost factor to labor elements that have limited to no associated material costs, causing the IGE to be higher than it otherwise would have been (*id*.). The IGE for Annex 1502000 materials (approximately $4.5 million/year after sales tax) was conservative in comparison to Chugach's actual recorded material costs during performance of the WSBOS contract of approximately $2.37 million in FY15 and $3.05 million in FY16 (app. supp. R4, tab 656 [native], Sheet: "ELIN-BASE PERIOD FFP," Cell N777 ($4,133,863.43 in Total Material Costs) and Cell O777 ($355,512.26 in Materials Sales Tax); app. supp. R4, tab 1657 at CSUP65940, CSUP65944). On a percentage basis, Mr. Hrenko's 30% estimate for 1502000 materials (equates to an average of 27% due to not being applied to every labor dollar) was conservative compared to the approximately 18.5% that CFSI actually incurred for Annex 1502000 materials in FY15 and FY16, respectively.[2]

---

[1] In his deposition, the government's expert witness Mr. Schaeb testified that Mr. Hrenko could not explain how he came up with the 6.6 hour figure. Mr. Schaeb was of the opinion that the 6.6 hour figure was a mistake. (App. ex. 13 at 175-77)

[2] The estimate is supported by calculations performed on spreadsheets in the record (app. supp. R4, tab 656, Sheet: "ELIN-BASE PERIOD FFP", Cell N777 ($4,133,863.43 in Total Material Costs) and Cell O777 ($355,512.26 in Materials Sales Tax) divided by the Sum of Cells M18 to M730 ($16,587,842 in Direct Labor Costs); app. supp. R4, tab 1657 at CSUP65940 (FY15 Annex 1502000: $2.37M in Direct Materials divided by $12.8M in combined Direct Labor, Direct Burden and Direct Fringe is approximately 18.5%), CSUP65944 (FY16 Annex 1502000: $3.05M in Direct Materials divided by $16.5M in combined Direct Labor, Direct Burden and Direct Fringe is approximately 18.5%)).

III.  CFSI'S PROPOSAL

A.  General Background

At the time of the competition, Chugach had never previously been awarded a competitively bid base operations service (BOS) contract, but had performed BOS contracts awarded as small business set-aside/sole source awards (R4, tab 5-3 at 176-77).  To develop CFSI's proposal, Chugach assembled a proposal development team consisting primarily of employees in its business development group and assisted by employees of other Chugach corporate entities and third-party consultants (R4, tab 6-47 at CFSI101373_4-7; R4, tab 5-3 at 9, 66).  Chugach's Mr. Hammock authored a document known as the Capture Plan Worksheet, that included Mr. Hammock's initial "price-to-win-target price," which Mr. Hammock initially believed to be $300 million, with a "Recurring price" of $45 million per year (R4, tab 6-123 at CFSI98525_1; tab 5-3 at 107-09).  The term "price to win" refers to an overall bid price that has "reached a level that we [Chugach] feel[s] is competitive."  To the extent Chugach's "solution price" is not at a competitive level, Chugach "look[s] for ways [to] achieve reductions" (R4, tab 5-10 at 245).

One of the proposal strategies within Chugach's concept of operations (also known as a "CONOPS") was the "hub and spoke" concept, which Mr. Hammock described as Chugach "center[ing] most of our resources at Bangor and then have right-sized locations and then support them with push-out teams that would perform maybe periodic type of maintenance" (R4, tab 5-3 at 79-80; R4, tab 6-123 at CFSI98525_4).  Chugach held a kick-off meeting with its proposal team to discuss the development of its proposal.  In a kick-off meeting PowerPoint presentation dated January 18, 2012, Chugach identified on a slide entitled "Capture Strategy/Win Plan Overview" a "Price to Win target" of $300 million, comprised of $40 million for recurring work and $20 million for non-recurring work.  The slide also provided: "Focus on reducing Recurring cost below $40M" noting that "FTE/Vehicles/IMP [are] heavy cost drivers."  (R4, tab 6-124 at CFSI101373_38)  Ultimately, CFSI bid roughly $30 million per year for recurring work, or $10 million less than its initial price to win target (R4, tab 2-39.1 at GOV468687_39; tab 6-123 at CFSI98525_1; Tab 5-3 at 107-09).

The kick-off meeting presentation also noted scope changes from the EJB contract including increases because "trouble calls [are] now only $5K liability (vs $2K and $5K)" and "New Integrated Maintenance Program (IMP) with $10K limit of liability for all prescribed items (vs $500 threshold for other general PM)" (R4, tab 6-124 at CFSI10373_19).

During the development of CFSI's proposal, Chugach's business development personnel generally did not involve Chugach's/CFSI's operations and management

12

personnel (who would actually perform the work if awarded the contract) in discussions of cost, out of concern that they "can't take the tough cuts" and are "scared to take a risk" (R4, tab 12-144.1 at CFSI104803_1).

B.  Chugach's Use of Historical Workload Data Provided in the WSBOS Solicitation

Chugach prepared estimates for the labor hours necessary to complete the various contract requirements based upon industry guides such as RS Means, subject matter experts within Chugach, and Chugach's own experience with other BOS contracts (R4, tab 5-10 at 96-97).  For Annex 1502000 and 1502010 maintenance, Chugach attempted to create an RS Means-based estimate for all of the assets and facilities identified in the Annex 15 Attachments in Section J (R4, tab 6-54 at CFSI7359_1).  Ultimately, a spreadsheet largely based on RS Means titled "West Sound WBS Pricing (4)" formed the "numerical starting point[]" for Chugach's effort to develop its proposal for Annex 15 (R4, tab 12-247.1 ("West Sound WBS Pricing (4)" spreadsheet); R4, tab 7-37 at 7; R4, tab 10-1 at 26-31; gov't ex. 4 ¶¶ 47-54).  Upon developing labor hour estimates for the various specification items detailed in the solicitation, whether by himself or in conjunction with other members of the proposal development team, Mr. Watts recorded the estimates in a spreadsheet known as the "Work Breakdown Structure" (WBS) or workload model (R4, tab 6-49; R4, tab 5-10 at 141-42; R4, tab 5-3 at 36-37, 60, 231, 245-46; R4, tab 5-1 at 14-15).  The labor hour estimates in the WBS model were "a summary of CFSI's estimated work hours by labor craft" for various PWS spec items (R4, tab 7-37 at 2).  Because staffing represents about 85 percent of CFSI's cost of performing base operations services, Mr. Crosta relied on the labor hour estimates in the WBS to develop CFSI's cost model (R4, tab 5-3 at 36-37, 152).  Mr. Crosta testified that the staffing estimated in the WBS, including "labor category, labor type and the full-time equivalent(s)" flowed directly into the cost model (R4, tab 5-1 at 12-13; R4, tab 7-37 at 5).  The cost model was then used to calculate the values (dollars, labor hours, and FTEs) presented in Chugach's final revised price (R4, tab 7-37 at 1).

C.  The "Option Year Modifier"

One of the elements that Mr. Watts included in the WBS was titled an "option year modifier" that modified the number of labor hours input into the WBS (R4, tab 6-49 at Column Q).  The specific option year modifier used in the WBS varies by specification item, ranging from a modifier of 0% to a modifier of 112% (R4, tab 6-1 at Column Q; tab 6-49 at Column Q).  The option year modifier applied to the total labor hours assumed for the base year in addition to the option years (R4, tab 5-7 at 47).  Mr. Hammock testified that the option year modifier is synonymous with an "efficiency factor" (R4, tab 5-3 at 22-24; R4, tab 5-10 at 195-97).  He testified that Chugach typically applies an efficiency factor to staffing estimates developed for base

operations services proposals (R4, tab 5-3 at 137).  According to Mr. Hammock, the efficiency factor represents Chugach's business judgment about how much more efficiently it can perform the contract requirements compared to the "standard approach" assumed by common estimating resources such as RS Means (*id*.; R4, tab 5-10 at 89-90).  Mr. Hammock also testified, however, that, with respect to the WBS for the WSBOS contract, the option year modifier was applied not only against RS Means-based labor hour estimates but also against labor hour estimates based on Chugach's past performance and labor hour estimates based on the judgment of Chugach's in-house subject matter experts (R4, tab 5-3 at 138-39; R4, tab 5-10 at 96-97).  Mr. Hammock, as Chugach's corporate designee, testified that Chugach has no data, documentation, or other files that show how Mr. Watts (or anyone else) determined the specific option year modifier values in the WBS (R4, tab 5-10 at 92-93).  Mr. Hammock also testified that Chugach expected to be able to perform the WSBOS contract relatively more efficiently because it would implement "[b]etter scheduling techniques, better management oversight, [and] better supervision and training" (*id*. at 146; 197).

Mr. Williamson, who was tasked with assisting Chugach's internal review of Chugach's losses in 2016, testified that he "just couldn't make sense" of the WBS and that Mr. Watts "would talk in circles" (R4, tab 5-9 at 102-04).  Mr. Viramontes, the former transition manager who was hired back as a consultant to assist the review, testified that he "relentlessly chased [Mr. Watts], trying to just get some answers best that he had.  You know, he didn't have a lot . . . .[W]e couldn't get definitive answers about how he came up with the numbers" (R4, tab 5-6 at 75-77).  Mr. Hargis testified that, when he met with Mr. Watts to get an understanding of the WBS, Mr. Watts "provided some guidance as to his thought process [but it] really didn't help us much, because the numbers are what the numbers are" (R4, tab 5-4 at 65-67).  Mr. Watts testified at his deposition that he had no knowledge about the purpose of an option year modifier, or how the option year modifier was derived (R4, tab 5-8 at 119-20).

Regardless of how the option year modifier values were determined, their overall effect on the WBS was to reduce the total recurring work labor hours from 682,501.91 to 414,101.18 labor hours and full time equivalents (FTEs), for Chugach's self-performed recurring work, from 363.10 FTEs to 220.37 FTEs (R4, tab 6-1 at Cells S7 and T7; tab 10-1 ¶ 54). Chugach's FTE count prior to application of the option year modifier (363.10) is approximately the same number of FTEs that EJB performed with in FY 2010.  This figure was known to Chugach before it submitted its final proposal revision for the WSBOS contract in November 2013 (R4, tab 6-52 (email dated February 2, 2012 from Mr. Hammock, informing the proposal team that "as the WBS starts to flesh out we need to be well below the current staffing level . . . in FY 10, we saw that EJB had 364 employees plus 156 subcontract employees.") R4, tab 6-124 at CFSI101373_38 (noting for FY10 "EJB FTE count 364 + 156 Subs.")).

14

D.  The Learning Curve

Chugach's proposal also provided that it would reduce its total workforce by 3% each year for each of the option years (R4, tab 2-39.7 at GOV212643_4).  If implemented as proposed, this "learning curve workforce reduction" would result in a staffing reduction of approximately 10.5% from the base year to the final option year. This is a reduction of an additional 23.15 (220.85 - 197.70) FTEs of Chugach's labor, excluding subcontractors.  (*Id.*)  The 3% learning curve reduction was solely based on Chugach's business judgment (R4, tab 5-10 at 25-26; 65-66).  Mr. Hargis testified at his deposition that the learning curve was "not realistic," "very aggressive," and "a flawed plan to begin with" (R4, tab 5-4 at 30-31, 76-77, 99-100, 288).  In June 2014, after Chugach was awarded the WSBOS contract but before it started performing, Mr. Hargis wrote in an internal Chugach email that the learning curve was "a great selling point but is BS from an Ops standpoint" (R4, tab 6-134 at CFSI132904_1; R4, tab 5-4 at 77).

E.  Chugach's Response to the Integrated Maintenance Program Requirement

With respect to the integrated maintenance program (IMP) requirement, Mr. Hammock testified that the requirement's only impact to Chugach's proposal was that it comprised one of the underlying assumptions of the learning curve—the IMP requirement did not otherwise impact Chugach's staffing assumptions or proposal price, despite being a completely different approach to maintenance from the predecessor contract (R4, tab 5-10 at 13-19).  However, in Chugach's Kick-Off Meeting the IMP was described as a "heavy cost driver[]" (R4, tab 6-124 at CFSI101373_38).  Chugach recognized that failing to implement reliability centered maintenance (RCM) was resulting in performance of "very labor-intensive" and inefficient maintenance (R4, tab 5-7 at 89-91; R4, tab 6-73 at CFSI115660_1). Mr. Hammock himself described the transition from time-based PMs to RCM as one of the largest reductions to the WBS and implementing RCM would be one of the "most impactful" ways for Chugach to reduce its costs (R4, tab 6-128 at CFSI110675_1).

F.  Chugach's Treatment of Trouble Calls

Chugach used the quantity of trouble calls for FY11 from the WSBOS solicitation to determine the expected volume or number of trouble calls (R4, tab 7-37 at 6; R4, tab 10-1 ¶ 76).  Chugach additionally used its own historical data from Whidbey Island and Fallon to estimate the number of hours per trouble call (R4, tab 6-13 at CFSI97123_1; R4, tab 5-10 at 96-99, 144, 151; R4, tab 10-1 ¶ 76).  Chugach did not specifically estimate the material costs for trouble calls, but instead relied upon a contract-wide global estimate of material costs as 13.2% of "unwrapped costs" (labor, vehicles/equip., and ODCs) (gov't ex. 4 ¶ 13).  However, because Chugach applied an

option year modifier of 55% to its original estimated level of effort to perform trouble calls, the result was that Chugach assumed that it could perform more efficiently (i.e., using fewer hours per trouble call) than its own performance at Whidbey and Fallon (R4, tab 5-10 at 151-53, 197; gov't ex. 4 ¶¶ 39-40).

Chugach's employees recognized that the unlimited trouble calls in the WBOS solicitation would result in increased numbers of trouble calls compared to historical data.  Mr. Hargis testified that the change to unlimited trouble calls "incentivized" Navy customers to call in more trouble calls "because there's no limit," in contrast to the EJB contract, under which those customers "were disincentivized because they had to pay for" extra trouble calls (R4, tab 5-4 at 140-46).  Mr. Viramontes testified that an unlimited number of trouble calls makes the WSBOS contract more risky than the EJB contract (R4, tab 5-7 at 75-76).  With respect to the "unlimited" trouble calls contemplated by the WSBOS solicitation, Mr. Hammock testified that Chugach specifically identified the risk of an increase in workload "much greater than historical" as a result of the change.  Rather than model that risk as an increased estimate for trouble call hours, Chugach opted to account for that risk in the profit markup it would seek under its fee.  (R4, tab 5-10 at 31-33; R4, tab 12-232.1 at CFSI107046_1; R4, tab 12-232.2 [native] at Sheet: Summary, Cells A22, C22 (determining after the Government provided clarification that trouble calls were unlimited that there was no cost impact))  With respect to the shorter response times to respond to trouble calls, Mr. Viramontes testified that shorter response times will generally increase the number of FTEs needed to handle a given number of trouble calls (R4, tab 5-6 at 190-91; R4, tab 5-7 at 40-41).  With respect to the $5,000 limitation of liability for trouble calls, which was different from the EJB Contract's two-tier $2,000 and $5,000 limitations of liability, (R4, tab 6-124 at CFSI101373_19), Chugach's 30(b)(6) witness testified that the $5,000 limitation of liability on trouble calls had no impact on Chugach's proposal (R4, tab 5-10 at 55-56).  However, Mr. Haunton testified that the increase in liability limits from the EJB contract to the WSBOS contract was significant: "Well, any time you double the cost . . . it's significant going from . . . a liability limit of $5,000 per work order and, for a utility piece of equipment, to 10,000, that's significant" (R4, tab 5-5 at 95).  Mr. Haunton testified that higher liability limits would, at least "in theory," cause the FTEs for recurring work to be higher (*id*. at 96-97; R4, tab 6-112 at CFSI239913_23 (May 16, 2016, Chugach presentation stating that the change in liability limits has "major cost implications.")).  Mr. Crosta testified that the higher the liability limit the higher the risk to a contractor (R4, tab 5-1 at 78-79; *see also* R4, tab 6-12 at CFSI98065_1).

IV.  THE SOURCE SELECTION

A.  Initial Proposals

On or before the February 28, 2012 proposal deadline, CFSI and eight other offerors submitted proposals in response to the RFP (compl. ¶ 36).  One of the other offerors was West Sound Services Group (WSSG), which was a Limited Liability Company formed between J&J Worldwide Services and EMCOR Government Services, which had been two of the three entities that formed EJB, the incumbent contractor performing the EJB contract (R4, tab 2-35.16 at GOV549288_1; *EJB Facilities Servs.*, 15-1 BCA ¶ 35,867 at 175,350 n.1).  WSSG represented that, through its experience with EJB it possessed the "institutional knowledge that constitutes the baseline for our technical approach" (R4, tab 2-35.16 at GOV549288_1).  One of the other offerors was LINC Government Services LLC (LGS), which was the successor entity to BMAR & Associates, the third entity that comprised EJB (R4, tab 2-7.4 at GOV544202_4; *EJB Facilities Servs.*, 15-1 BCA ¶ 35,867 at 175,350 n.1).  One of the other offerors was IAP-HILL, LLC (IAP), a joint venture managed by IAP Worldwide Services, Inc (R4, tab 2-3.15 at GOV543992_1). Through its subsidiary IAP World Services, Inc., IAP Worldwide Services had performed the base operating services contract that preceded the EJB contract (*id*. at GOV543992_6-10).  Moreover, IAP Worldwide Services' contract was the result of a successful rebid, meaning that IAP Worldwide Services had actually performed base operations services at West Sound for nearly 15 years prior to the EJB contract (*see id*. at GOV543992_9).

Chugach's proposal dated February 28, 2012, states that its bid is based on achieving significant efficiencies and cost savings throughout the scope of the contract. Under "Factor 2 – Technical Approach/Method," the proposal states that Chugach would perform the WSBOS contract with a "lean workforce" by using a "'hub and spoke' concept of operations" and, of Chugach's plan to further reduce its workforce by 3% each year, asserted that Chugach had "achieved similar efficiencies" on similar contracts (R4, tab 2-4.7 at GOV209039_30)  Under "Factor 3, Management Approach/Capability of Key Personnel," Chugach's proposal asserts that it expects to achieve efficiencies from its "hub and spoke" concept of operations, and its adoption of its RCM program in conjunction with Nelson Engineering (*id*. at GOV209039_75).

Chugach's proposal also asserts that "Chugach will enhance our workforce flexibility through cross-utilization" and that cross-training and cross-utilization of employees are "key components for gaining maximum efficiency from a lean workforce . . ." (*id*. at GOV209039_81).

Chugach's proposal assumed a staffing level of 322.85 FTEs (*id*. at GOV209039_45).  Chugach's estimate of approximately 323 FTEs was not an outlier from the other offerors.  Three offerors estimated fewer FTEs and five offerors

estimated more FTEs (R4, tab 2-5.16 at GOV544729_4 (WSSG, proposing 293 FTEs); R4, tab 2-3.16 at GOV544015_21 (IAP-HILL, proposing 303 FTEs); R4, tab 2-6.11 at GOV1023145_16 (G4S, proposing 306 FTEs); R4, tab 2-4.7 at GOV209039_45 (Chugach, proposing 323 FTEs); R4, tab 2-7.4 at GOV544202_47 (LGS, proposing 324 FTEs); R4, tab 2-2.14 [native] (Exelis, proposing 324 FTEs); R4, tab 2-1.4 at GOV1022936_38 (Fluor, proposing 352 FTEs); R4, tab 2-8.5 at GOV1023289_17 (NWSS, proposing 396 FTEs); R4, tab 2-9.7 at GOV1023680_45 (Star3, proposing 428 FTEs)). Of the three offerors with prior experience at West Sound, WSSG (293 FTE) and IAP (303 FTE) both estimated fewer FTEs than Chugach, and LGS (324) estimated 1 more FTE than Chugach (R4, tab 2-5.16 at GOV544729_4; R4, tab 2-3.16 at GOV544015_21; R4, tab 2-7.4 at GOV544202_47).

NAVFAC did not evaluate the offerors' original proposals because, on July 24, 2012, it issued Amendment 0011 which, among other things, made various adjustments to the PWS (R4, tab 1-12.1 at GOV14201; R4, tab 6-62 at E1; R4, tab 4-44 at GOV29294).

B. The First Proposal Revisions

On or before August 9, 2012, Chugach submitted a first proposal revision (R4, tab 4-44 at GOV29294). Chugach's first proposal revision estimated a staffing level of 329.04 FTEs, an increase of 6.19 FTEs over its original proposal (*see* compl. ¶ 40). Once again, Chugach's staffing proposal was not an outlier, with five offerors estimating fewer FTEs and three offerors estimating more FTEs (R4, tab 2-14.9 at GOV542646_4 (WSSG, proposing 290 FTEs); R4, tab 2-15.12 at GOV542048_16 (G4S, proposing 307 FTEs); R4, tab 2-12.12, GOV1022477_21 (IAP-HILL, proposing 308 FTEs); R4, tab 2-11.14, [native] (Exelis, proposing 323 FTEs); R4, tab 2-16.3 at GOV936647_2 (LGS, proposing 322 FTEs); R4, tab 2-13.9 at GOV208762_45 (Chugach, proposing 329 FTEs); R4, tab 2-10.4 at GOV541908_4 (Fluor, proposing 359 FTEs); R4, tab 2-17.7 at GOV542492_10 (NWSS, proposing 398 FTEs); R4, tab 2-18.6 at GOV936713_46 (Star3, proposing 434 FTEs)). Of the three offerors with prior experience at West Sound, all three estimated fewer FTEs than Chugach, with WSSG estimating 290 FTEs, IAP estimating 308 FTEs, and LGS estimating 322 FTEs (R4, tab 2-14.9 at GOV542646_4 ; R4, tab 2-12.12, GOV1022477_21; R4, tab 2-16.3 at GOV936647_2).

In a memorandum dated August 15, 2012, NAVFAC's Technical Team documented its review of the first proposal revisions (R4, tab 2-42.2 at GOV474771). Regarding the FTE's estimated by Chugach's First Proposal Revision, the Technical Team's report states:

> The hours proposed appear to be underestimated in annex
> 020000, 150000, 16000, and 180000. This is also

18

> represented in the number of FTE's proposed in these annexes.  The estimated level of effort in hours is not consistent or comparable with that estimated by the Government when considering the Key Personnel and administrative functions in Annex 020000 and the differing service call response times and IMP requirements of Annex 150000.  Though little has changed with the requirements of Annex 180000, the man-hour estimate falls short of current Independent Government Estimate (IGE) figures based on the current workload.
>
> 20000- FTE's appear low in comparison to the IGE; the J.M-5 does not require that activities in annex 2 be separately listed so it cannot be determined what activity is understaffed. The proposal is 15 FTE's less than the IGE.
>
> 150000- FTE's appear significantly low in trouble calls and maintenance. This demonstrates a misunderstanding of the staffing levels required to perform "no limit" trouble calls and meeting the requirements of IMP.  The proposal is 75 FTE's below the IGE.
>
> 160000- FTE's appear low in electrical utility operation requirements.  The proposal appears to not consider the number of FTE's required to perform these operations.
>
> 180000- FTE's appear low in hazardous waste management services.  The proposal is 6 FTE's below the IGE.
>
> This is also concerning because one of Chugach's proposed objectives is to realize a "learning curve" and reduce FTE's 3% over the life of the contract through efficiency.
>
> Staffing in all other annexes was approximately equal to the IGE.

(*Id*. at GOV474785-86)

The Technical Team report also states, of Chugach's first proposal revision, that "[a]ll annexes demonstrate an understanding of the requirements and describe a method and approach to accomplish RFP requirements" (*id*. at GOV474786).  Of

19

Chugach's representation that it would partner with a third-party engineering firm (Nelson Engineering) to develop and implement the required IMP program, the Technical Team report states that "[t]his was viewed as a strength by the board due to the importance of an IMP program that is continually monitored and adjusted to realize a balance of performance and reliability" (*id.* at GOV47487).

As a result of the Technical Team's finding that Chugach's estimated FTEs for Annexes 020000, 160000, and 180000 appeared "low," and that Chugach's estimated FTEs for Annex 150000 appeared "significantly low," the Technical Team concluded that Chugach's First Proposal Revision had a "significant weakness" related to staffing levels (*id.* at GOV474785-86, 88).

The Technical Team's findings regarding whether an offeror's estimated FTEs were "low," "high," "significantly low," or "significantly high" were based on the difference between the offeror's estimated FTEs and the FTEs estimated by the IGE (*id.* at GOV474785-86; app. ex. 3 at 132-33, 141, 143).  The technical team assigned a "significant weakness" related to staffing levels to eight of the nine offerors (R4, tab 2-42.2 at GOV474788, GOV474813, GOV474839, GOV474863, GOV474888, GOV474915, GOV474940, GOV474989).

In a report dated September 11, 2012, the Source Selection Advisory Council (SSAC) documented its review of the reports prepared by the Technical Team and Price Team and provided its recommendations to the Source Selection Authority (SSA) (R4, tab 2-42.4 at GOV1722534).  With respect to the staffing estimated by the offerors, the SSAC report states:

> One of the areas of concern is the number of offerors whose proposed staffing for recurring work was significantly less than the 396.64 FTEs estimated by the Government.  WSSG, ICHS, and LGS proposed 246.84, 283.21, and 291.63, respectively, and are approximately 105 to 150 less than the GE.  G4S, ESC, CFSI, and FSS proposed 307.2, 324.74, 328.91, and 358.50 FTEs, respectively.  Although closer to the GE, the proposed FTEs ranged from approximately 38 to 89 less than the GE.  With 398.27 and 400.87 FTEs proposed, NWSS and Star 3, respectively, were comparable to the GE; they are also the highest priced.

> The variance between the FTE count between most of the offerors and the GE can be attributed [to] several things.  The GE could be in error, or offerors are attempting to position themselves favorably for contract award.  It is also

20

possible that a lower FTE count can be the result of improved, more efficient work practices or methodologies and an increased use of technology. However, the primary focus of this contract is the provision of public works maintenance services which are traditionally labor intensive. The wide range of FTEs is an indicator that offerors should be prompted to review the performance work statement to ensure their proposals include the level of effort required.

Both the Technical and Price team reviewed proposed FTEs and developed proposed questions to support their concerns. The Technical Team's review was based on a comparison of the offerors' proposed staffing compared to the GE. The price report utilized a standard deviation analysis method that is more detailed and comprehensive than the Technical Team's approach that included all offerors' and the Government's FTE estimates. Both teams considered the proposed FTEs by annex for recurring work. Despite the apparent duplication of effort, both teams focused on separate issues. The Technical Team's proposed questions are focused on specific areas within an annex that appear under- or over-staffed while the price report approaches FTEs from a price perspective. The FTE concerns expressed by both teams are valid, and it is recommended that the questions prepared by each team be presented to the offerors during discussions.

(*Id*. at GOV1722546-47)

The SSAC report recommended that all nine offerors remain in the competitive range and be provided an opportunity to revise their proposals. With respect to CFSI, the report states:

Offering the lowest price and rated Acceptable overall, Chugach Federal Solutions appears to be a strong candidate for contract award. Discussions will permit the offeror to potentially increase its technical weaknesses in Factors 2 and 3. Discussions will also provide the offeror an opportunity to review its proposed 328.91 FTEs for recurring work to ensure its proposed workforce can comply with the RFP requirements.

21

(*Id*. at GOV1722547)  In a memorandum dated September 26, 2012, Steve Shapro, the
designated Source Selection Authority (SSA), documented his agreement with SSAC's
recommendation to enter discussions with all nine offerors.  The SSA also documented
his comments about the difference between the IGE and the majority of the First
Proposal Revisions:

> As discussed in reference (a), the IGE price and FTEs are
> significantly higher than the price and FTEs on the
> majority of the proposals.  []  As discussed at FAR 15.404-
> 1, Proposal Analysis Techniques, the RFP states that price
> analysis will be performed by a number of techniques
> including the comparison of proposals to the IGE.  Given
> the significant variation between the IGE and proposed
> prices and FTEs, the IGE should be validated by the
> Government team that developed it.  If necessary, the IGE
> should be revised prior to completing the price evaluation
> of proposals received following discussions.  The
> validation of the IGE and the rationale for any revisions
> should be documented in the Price Evaluation Team's final
> report.

(App. supp. R4, tab 853 at CSUP29972-73)

David Williams, the NAVFAC employee with overall responsibility for
compiling the IGE, subsequently undertook the requested "validation" of the IGE
(app. supp. R4, tab 1062 at CSUP38470).  On November 7, 2012, NAVFAC issued an
evaluation notice to Chugach regarding Chugach's first proposal revision (R4, tab 2-
42.5 at GOV474578).  The evaluation notice sent to Chugach included eighteen
discussion questions directed at its price proposal (*id*. at GOV474583-84) and five
discussion questions directed at its nonprice proposal (*id*. at GOV474585).  Among the
questions, regarding Factor 2, Technical Approach/Methods, the evaluation notice
asked

> After reviewing the Performance Work Statement for
> Annexes 020000, 150000, and 180000, please ensure your
> hour estimates and FTE staffing for these annexes has
> adequately addressed no limitation to trouble call
> quantities, the increased requirements of the RFP (over
> historical) maintenance program including IMP, and
> environmental services specifically hazardous waste
> management.

(*Id*.)

C.  Second Proposal Revisions

Chugach and the other eight offerors submitted second proposal revisions on or about November 20, 2012 (R4, tab 2-43.1 at GOV475007).  Chugach's second proposal revision estimated a staffing level of approximately 318 FTEs (R4, tab 2-22.7 at GOV1602610_16 (Chugach, proposing 318 FTEs)).  Once again, Chugach's estimate of approximately 318 FTEs was not an outlier from the other offerors.  Three offerors estimated fewer FTEs and five offerors estimated more FTEs (R4, tab 2-21.12 at GOV473763_4 (IAP-HILL, proposing 254 FTEs); R4, tab 2-23.11 at GOV1598994_4 (WSSG, proposing 290 FTEs); R4, tab 2-24.15 at GOV936827_8 (G4S, proposing 309 FTEs); R4, tab 2-20.17 [native] (Exelis, proposing 332 FTEs); R4, tab 2-25.4 at GOV936873_32 (LGS, proposing 359 FTEs); R4, tab 2-19.6 [native] (Fluor, proposing 371 FTEs); R4, tab 2-26.6 at GOV1723728_5 (NWSS, proposing 385 FTEs); app. supp. R4, tab 936 at CSUP36316 (Star3, proposing 423 FTEs)).  Of the three offerors with prior experience at West Sound, IAP (254 FTEs) and WSSG (290 FTEs) estimated fewer FTEs and LGS (359 FTEs) estimated more FTEs (R4, tab 2-21.12 at GOV473763_4; R4, tab 2-23.11 at GOV1598994_4; R4, tab 2-25.4 at GOV936873_32).

In a report dated December 5, 2012 (R4, tab 2-43.2), the Technical Team documented its review of Chugach's second proposal revision, including its responses to NAVFAC's November 7, 2012 evaluation notice (*id*. at GOV475164-89).  As part of its analysis, the price team performed a "statistical" analysis that attempted to identify bid prices for specific annexes as being high and low (R4, tab 2-42.1 at GOV474675).  Chugach contends that the Navy's analysis was flawed, because the government assumed a normal distribution and then eliminated any prices that it considered to be "outliers" and then recalculated the mean and standard deviation (*id*.).[3]  To the extent that the government eliminated outliers that it considered to be "too high" the effect would be to reduce the mean and the standard deviation.  However, the government contends, in essence, that it was simply using the analysis as a tool to identify prices that were high or low relative to the other offerors (that is, descriptive statistics rather than inferential statistics)[4] (app. ex. 7 at 68-70; R4, tab 2-42.1 at GOV474625).  Chugach additionally contends that the standard deviations, even after the elimination of outliers and recalculation, were too large to function as

---

[3] A standard deviation is measure of the variation or dispersion of a data set.  A data set with a low standard deviation would have data points tightly clustered around the mean (mathematical average), while a data set with a large standard deviation would have data points with a greater spread.

[4] As an example, house prices do not follow a normal distribution.  Descriptive statistics can tell whether the price of a particular house is high or low relative to other houses, but cannot estimate the probability that a house will be worth a certain price.

reliable tools (R4, tab 6-171 ¶ 105).  However, to the extent the standard deviations were too large to function as reliable tools, this would discredit Chugach's superior knowledge argument because the price team would not have known, from the standard deviation that Chugach's proposal prices were too high, or too low.

Regarding CFSI's response to the evaluation notice's discussion question regarding Factor 2 – Technical Approach/Methods, the Technical Team report states:

> DISCUSSION QUESTION: After reviewing the Performance Work Statement for Annexes 020000, 150000, and 180000, please ensure your hour estimates and FTE staffing for these annexes has adequately addressed no limitation to trouble call quantities, the increased requirements of the RFP (over historical) maintenance program including IMP, and environmental services specifically hazardous waste management.
>
> RESPONSE: Chugach clarified that a review of the PWS was conducted and a revised J.M-5 was provided.  The revised J.M-5 resulted in an overall loss of 12 FTE's across all annexes with no changes to annex 020000 and 180000. Annex150000 and 160000 were reduced by approximately 5 FTE's and 6 FTE's respectively.
>
> EVALUATION RESULTS OF RESPONSE: The board concluded that the contractor response and revised J.M-5 did not adequately address the Government[']s concern; however the revised proposal acknowledged that Chugach determined the staffing levels were sufficient to accomplish the requirements of the RFP.  The significant weakness remains.

(R4, tab 2-43.2 at GOV475171-72)

In a report dated December 10, 2012, the Price Team documented its review of the offerors' second proposal revisions (R4, tab 2-43.1 at GOV475007, GOV475156). In a memorandum dated December 19, 2012, David Williams documented his IGE "validation" (app. supp. R4, tab 1062 at CSUP38470; app. supp. R4, tab 1062.01 at CSUP38472-75).[5]  Mr. Williams concluded that the IGE was a "reasonable" estimate of the cost to fully and satisfactorily perform the requirements of the WSBOS contract; however, he observed that the IGE was "conservative" compared to what

---

[5] The IGE validation memorandum is dated 9 days after the price team report.

might be proposed by contractors in a competitive bidding environment (app. supp. R4, tab 1062.01 at CSUP38473-74). In its report regarding the second proposal revisions, the SSAC noted that the Technical Team "relied heavily upon the IGE when evaluating proposed FTEs" (R4, tab 2-43.4 at GOV1202881). Given Mr. Williams' conclusion that the IGE represented a conservative estimate, the SSAC concluded that the IGE could be used as a benchmark for "a maximum staffing number that should not be exceeded; however, it cannot offer assistance in determining the minimum FTEs required" (*id*.). Accordingly, the SSAC compared the offerors to each other rather than the IGE (*id*.). Based on that comparison, the SSAC report stated that "the [SSAC] does not believe that the FTE significant weaknesses noted by the TT in Factor 2 for CFSI, G4SGS, LGS, and ESC are appropriate" (*id*. at GOV1202882). The SSAC report recommended removal of the significant weakness findings (*id*.). In addition, the SSAC report recommended eliminating five of the offerors from the competitive range: LGS, WSSG, G4SGS, NWSS, and Star3 (*id*. at GOV1202883-85).

In a memorandum dated January 8, 2013, the Source Selection Authority (SSA), Steve Shapro, documented his decision to eliminate five of the nine offerors—G4SGS, LGS, NWSS, Star3, and WSSG—from the competitive range (app. supp. R4, tab 1068 at CSUP38498-501). Remaining in the competitive range were CFSI, ESC, FFS, and IAP (*id*. at CSUP38501-02).

Regarding the IGE, the SSA's memorandum states:

> During evaluation of initial proposals, it was noted that the IGE price and Full Time Equivalent staff (FTE) were significantly higher than the price and FTEs on most of the proposals. As a result, the Government team that developed the IGE was requested to validate it. The Government team verified the calculations, reviewed the estimates for realism, and confirmed underlying assumptions of the IGE.
>
> The Government determined the IGE by calculating the efforts and resources required to perform each annex independently. The individual annex estimates were then aggregated to develop an overall IGE. The Government took minimal risks in developing the IGE and did not attempt to incorporate resource leveling across the annexes. Conversely, the contractors' price and FTE estimates most certainly include the cross utilization of personnel based on business decisions that reflect tradeoffs between risks and costs. This difference in approach is essential as it explains why there is such a difference

> between the "theory" used by the Government to develop its staffing estimate when compared to the offerors' practical and realistic approach of reallocating staffing resources to meet performance needs.  As a result of the Government's conservative methodology, the IGE is at the high end of the price and FTE spectrum.  A review of the Price Report and SSAC reports indicate that the source selection team was cognizant of this information and addressed appropriately it [sic] in their analysis of the proposals.

(*Id*. at CSUP38498)

> Regarding Chugach's second proposal revision, the SSA's memorandum states:
> CFSI: CFSI offers a strong technical proposal and is rated Good overall.  Technically, this firm is ranked fourth and offers the lowest price.  At this stage of the competition, considering the technical factors and price, CFSI's proposal is the most competitive for award.

(*Id*. at CSUP38501)

On January 23, 2013, the Navy informed WSSG that it had been eliminated from the competitive range (app. supp. R4, tab 1083.03 at CSUP38613; *West Sound Services Group, LLC*, B-406583.2, B-406583.3, 2013 CPD ¶ 276 (Comp. Gen. Jul. 3, 2013)).  Following an agency-level protest (R4, tab 8-30 at GOV1708526_1-2), WSSG protested the Navy's decision to the GAO on March 25, 2013 (*id*.).  On July 3, 2013, GAO issued its decision sustaining the protest and recommending that WSSG be added back into the competitive range (R4, tab 8-32 at GOV1709748_1-22).

D.  Third Proposal Revisions

On or about February 1, 2013, after WSSG had been excluded from competition but before the resulting protest had been resolved, Chugach, ESC, FFS, and IAP, the four offerors remaining in the competitive range, submitted third proposal revisions (R4, tab 2-27.2 at GOV548079_1; R4, tab 2-28.3 at GOV1599142_1; R4, tab 2-29.1 at GOV548591_1; R4, tab 2-30.3 at GOV212713_1).  Chugach's third proposal revision estimated a staffing level of 288 FTEs (R4, tab 2-30.6 [native], Cell U73).  Chugach's estimate of approximately 288 FTEs was not an outlier from the other offerors.  IAP, the remaining offeror with prior experience at West Sound, estimated 272 FTEs (R4, tab 2-29.12 J.M-1 Additional Pricing Info [native], Cell U73).  FFS and ESC estimated 342 and 327 FTEs, respectively (R4, tab 2-27.4, J.M-1 Additional

26

Pricing Info [native], Cell U73; R4, tab 2-28.9, J.M-1 Additional Pricing Info, Cell T73).

On July 10, 2013, after reinstating WSSG and reopening discussions in response to GAO's decision in B-406583, the government issued an evaluation notice to Chugach (R4, tab 2-44.4 at GOV474548).  The evaluation notice included four discussion questions, including the following:

> 1.       Summary of Recurring Work FTEs Findings.
> Applies to both the price and non-price proposals.  []
> While your overall recurring work FTEs are within an
> acceptable range, your recurring work FTEs for specific
> annexes 0401060, 1501000, 1502000, and 1502010 appear
> low, and your FTEs for 1503020, 1503030, 1600000,
> 1602000, 1603000, 1605000, and 1607000 appear high.
> Please review and amend or confirm your FTEs for each
> listed annex as required.

(*Id*. at GOV474553)

E.  Fourth Proposal Revisions

Chugach's fourth proposal revision, dated July 25, 2013, estimated approximately 292 FTEs (R4, tab 2-34.7 at GOV548623_7).  Chugach's estimate of approximately 292 FTEs was not an outlier from the other offerors.  IAP, which had prior experience at West Sound, also estimated approximately 292 FTEs (app. supp. R4, tab 1201.02 at CSUP41460 (IAP-HILL, proposing 292 FTEs); R4, tab 2-34.7 at GOV548623_7 (Chugach, proposing 292 FTEs); R4, tab 2-35.19 at GOV549313_4 (WSSG, proposing 295 FTEs); R4, tab 2-31.6 at GOV1057084_16 (Fluor, proposing 298 FTEs); R4, tab 2-32.14 [native] (Exelis, proposing 336 FTEs)).  WSSG, comprised of two of the three joint venturers that had performed the EJB Contract, estimated approximately 295 FTEs (R4, tab 2-35.19 at GOV549313_4).  Flour and Exelis estimated approximately 298 and 336 FTEs, respectively (R4, tab 2-31.6 at GOV1057084_16; R4, tab 2-32.14 [native]).  In a memorandum dated July 31, 2013, the Price Team documented its evaluation of the Fourth Proposal Revisions (R4, tab 2-45.1 at GOV475476, GOV475511).  In a memorandum dated August 8, 2013, the Technical Team documented its evaluation of the fourth proposal revisions and ranked Chugach's fourth proposal revision second with a technical rating of "Good" (R4, tab 2-45.2 at GOV475512-13).  The Technical Team report summarizes the strengths and weaknesses of Chugach's fourth proposal revision as pertains to Factor 2, Technical Approach/Methods, as follows:

Strengths:

> • Contract Security Manager and HVAC/R Supervisor
> offers significant experience.
> • Third party engineering partner will be utilized to
> develop and continuously improve IMP program.
> • Technology based metric that defines activities
> performed to equipment under IMP.
>
> Weaknesses: None noted
>
> Significant Weaknesses:
> • Despite discussions, new electrical supervisor proposed
> lacks NERC Certification and does not meet RFP
> requirements.
> • [sic]
> Deficiencies: None noted

(*Id*. at GOV475528) In a memorandum dated September 12, 2013, the SSA documented his decision to end discussions and request final proposal revisions from the five offerors in the competitive range: Chugach, ESC, FFS, IAP, and WSSG (R4, tab 2-45.5 at GOV475443, GOV475446). With respect to the IGE, the SSA memorandum states:

> During evaluation of initial proposals, it was noted that the
> IGE price was significantly higher than the price on most
> of the proposals. As a result, the Government team that
> developed the IGE was requested to validate it. The
> Government team verified the calculations, reviewed the
> estimates for realism, and confirmed underlying
> assumptions of the IGE.
>
> The Government determined the IGE by calculating the
> efforts and resources required to perform each annex
> independently. The individual annex estimates were then
> aggregated to develop an overall IGE. The Government
> took minimal risks in developing the IGE and did not
> attempt to incorporate resource leveling across the
> annexes. Conversely, the contractors' price most certainly
> includes the cross utilization of personnel based on
> business decisions that reflect tradeoffs between risks and
> costs. This difference in approach is essential as it
> explains why there is such a difference between the
> "theory" used by the Government to develop its staffing
> estimate when compared to the offerors' practical and

28

realistic approach of reallocating costs and staffing resources to meet performance needs.  As a result of the Government's conservative methodology, the IGE is at the high end of the price spectrum.  A review of the Price Report and SSAC reports indicate that the source selection team was cognizant of this information and addressed it appropriately in their analysis of the proposals.

(*Id*. at GOV475445)

Regarding the SSA's decision to end discussions and request final proposal revisions, the SSA memorandum states:

> 4. COMPETITIVE RANGE DECISION, ENDING DISCUSSIONS AND REQUESTING FINAL PROPOSAL REVISIONS
> Based on the Navy's evaluation of revised proposals following the last round of discussions, all five offerors should remain in the competitive range.  All firms are rated Good overall technically, and it is reasonable to assume the $36,892,887.52 or 13.03% variance between the lowest and highest priced offerors (CFSI and ESC, respectively) will decrease with the final proposals.
>
> As discussed at FAR 15.307, at the conclusion of discussions, each offeror remaining in the competitive range shall be given an opportunity to submit a final proposal revision. Accordingly, discussions should be ended and final proposal revisions should be requested from the five offerors in the competitive range: CFSI, ESC, FFS, ICHS and WSSG.
>
> A best value ranking of the firms will not be conducted until after receipt of final proposal revisions.

(*Id*. at GOV475446)

F.  Final Proposal Revisions

Chugach's Final Proposal Revision JM-5 reflected an estimate of approximately 311 FTEs (R4, tab 2-39.7 at GOV00212643_13 (Chugach, proposing 311 FTEs); gov't ex. 11 at 6). Chugach's final price proposal for FY15 Recurring was $31,613,147 (R4, tab 2-39.1 at GOV468687_39).  Chugach's estimate of

29

approximately 311 FTEs was not an outlier from the other offerors. Of the five offerors remaining, three estimated fewer FTEs than Chugach, including IAP (284 FTEs), which had prior experience at West Sound, and WSSG (289 FTEs), which was comprised of 2 of the 3 joint venturers that had performed the EJB Contract (R4, tab 2-38.14 at GOV547785_4 (IAP-Hill, proposing 284 FTEs); R4, tab 2-40.13 at GOV547893_4 (WSSG, proposing 289 FTEs); R4, tab 2-36.5 [native] (Fluor, proposing 298 FTEs); R4, tab 2-37.10 [native] (Exelis, proposing 336 FTEs); gov't ex. 11 at 6).

In a report dated December 4, 2013, the Technical Team documented its review of final proposal revisions (R4, tab 2-46.2 at GOV475707). Regarding Chugach's final proposal revision, the Technical Team report states:

> Chugach was ranked second; their proposal had a technical rating of Good. The factor ratings are as follows; Factors 1, Corporate Experience, Factor 2, Technical Approach/Methods and 3, Management Approach/Capability of Key Personnel, Factor 6, Small Business Utilization were determined to be Good. Factor 5, Safety was rated Outstanding. The TT felt that the Technical Approach/Methods was a strength over that of the remaining offerors due to the qualifications of a few key personnel in Factor 2 exceeding RFP requirements. Other noted strengths proposed were a third party partner to develop and continuously improve the IMP program as well as evaluate program effectiveness. The FTE's proposed by Chugach are second closest when compared to the IGE. The remaining significant weakness in Factor 2 was the Electrical Supervisor not being compliant with NERC certification.

(*Id*. at GOV475710)

In a memorandum dated January 10, 2014, the SSAC Chairperson, Audrey Fitzgerald, documented the SSAC's evaluation of the Technical Team's, Price Team's, and SSEB's supplemental findings and recommendation of which proposal offered the best value to the government (R4, tab 2-46.4 at GOV1722627, GOV1722629). The SSAC found that the Price Team "conducted a reasonable evaluation of the offerors' final proposals in accordance with the RFP" and accepted the Price Team's overall findings (*id*.). The SSAC further noted that the IGE was not used in the price analysis because "the proposed prices reflect the current market conditions and therefore a more accurate expected value" (*id*. at GOV1722630). The SSAC noted that the IGE had not been updated throughout the life of the procurement because "there was no

30

expertise available to rectify erroneous assumptions made when the estimate was initially prepared" (*id*.).  The SSAC summarized several deficiencies in the IGE.  For example, the SSAC noted that NAVFAC had never previously used an Integrated Maintenance Plan (IMP) concept in a regional facility maintenance contract, and so the government had no relevant historical data or experience with which it could estimate the IMP-associated costs (*id*.).  Regarding the FTEs estimated by each offeror, the SSAC concluded that it was appropriate to compare the offerors to each other.  All of the offerors demonstrated an understanding of the requirements and were proposing similar methods to meet the performance objectives of the WSBOS Contract.  (*Id*. at GOV1722633)

In a memorandum dated January 14, 2014, the SSA, Steve Shapro, found that "[t]he proposal submitted by CFSI represents the best value to the Government" (R4, tab 2-46.5 at GOV475656, GOV475670).  Regarding the IGE, the SSA's January 14, 2014 memorandum states:

> During evaluation of initial proposals, it was noted that the IGE price was significantly higher than the price on most of the proposals.  As a result, the Government team that developed the IGE was requested to validate it.  The Government team verified the calculations, reviewed the estimates, and confirmed underlying assumptions of the IGE.  The Government determined the IGE by calculating the efforts and resources required to perform each annex independently.  The individual annex estimates were then aggregated to develop an overall IGE.  The Government took minimal risks in developing the IGE, and did not attempt to
> incorporate resource-leveling across the annexes, which would involve the cross-utilization of personnel to perform multiple functions.  Conversely, based on our observation of BOSC contractor practices on current and prior BOSCs at the four major Naval installations within our Area of Responsibility, contractor price likely included the cross-utilization of personnel based on business decisions that reflect tradeoffs between risks and costs.  Since each offeror's approach to the risk and cost tradeoff will differ in a competitive environment, the Government cannot assume one approach over another and so took the more conservative approach.  This difference in the approach to pricing explains why there is such a difference between the IGE price developed by the Government, and actual offered prices.  As a result of the Government's

31

conservative methodology, the IGE is at the high end of the price spectrum. A review of the Price Report and SSAC reports indicate that the source selection team was cognizant of this information, and addressed it appropriately in their analysis of the proposals.

(*Id*. at GOV475658-59)

Regarding CFSI's non-price proposal, the SSA's January 14, 2014 memorandum states:

CFSI offered the second strongest technical proposal. For Factor 5, Safety, CFSI greatly exceeds solicitation requirements and was evaluated as Outstanding.

\* \* \*

For Factor 1, Experience, Factor 2, Technical Approach/Methods, Factor 3, Management Approach/Capability of Key Personnel, and Factor 6, Small Business Utilization, CFSI exceeded solicitation requirements and was assigned a rating of Good.

(*Id*. at GOV475661)

Regarding CFSI's price proposal, the SSA's January 14, 2014 memorandum states: "CFSI offers the lowest price. CFSI offers a total of 311.18 FTEs for recurring work, slightly higher than the mean of the five offers" (*id*. at GOV475667). The SSA ranked the five Final Proposal Revisions from lowest to highest price:

| Contractor | Total Evaluated Price | Total FTEs for Recurring Work |
|---|---|---|
| CFSI | $329,451,129.64 | 311.18 |
| FFS | $330,703,955.16 | 298.06 |
| ICHS | $348,946,841.89 | 284.4 |
| WSSG | $364,007,190.94 | 288.70 |
| ESC | $378,361,168.07 | 335.72 |
| Mean Total FTEs for Recurring Work | | 303.61 |
| Range of One Standard Deviation of Mean | | 282.93-324.29 |

(*Id*. at GOV475667)

The SSA's January 14, 2014 memorandum states:

32

> <u>CFSI offers the best value proposal and is ranked first</u>. The firm offers the lowest evaluated price and is ranked second technically.  Overall, its technical rating is Good with an Outstanding safety record.  CFSI proposes innovative methods to convey safety awareness to their workforce and demonstrated an exceptionally strong approach to the evaluation and determination of subcontractor safety.  An evaluation of Past Performance demonstrates there is substantial confidence in the offeror's ability to perform the contract.  For the price offered, CFSI offers good value in terms of recurring direct and total FTEs.

(*Id*. at GOV475667-68) (emphasis in original)

On March 21, 2014, the government awarded the WSBOS contract to Chugach (R4, tab 3-1 at GOV18529).  The PWS in the WSBOS Contract contains the same requirements, performance objectives, and performance standards as the WSBOS solicitation.  Consistent with the WSBOS solicitation's intent to incorporate the contractor's proposal "in whole or in part," the WSBOS contract incorporates parts of Chugach's Final Proposal Revision.  Specifically, the WSBOS contract defines as Attachments the J.B-1, the J.C-1, and the J.F-1, but does not incorporate the J.M-5 or J.M-1 from Chugach's proposal (*id*. at GOV18586).

## V.  THE POST-AWARD BID PROTEST

On or about March 31, 2014, WSSG filed a post-award protest with GAO, asserting that the award of the WSBOS contract to Chugach was improper because of various alleged source selection defects (R4, tab 8-2 at GOV1708553_1-2).  Among other things, WSSG's protest asserted that the government failed to perform a realism analysis of the FTEs proposed by Chugach and the other offerors (*id*. at GOV1708553_6).

During the course of the post-award protest, and subject to a GAO protective order, the government provided Chugach with documentation including the existence and amount of the IGE (R4, tab 12-372.1 at MSJ Exhibit 08_88 and 08_0124).  On or about April 16, 2014, the government and Chugach jointly requested that GAO issue a partial summary dismissal of the protest, arguing in part that the WSBOS Solicitation does not require a price realism analysis (R4, tab 12-368.1 at MSJ Exhibit 37_1).

On April 23, 2014, GAO partially dismissed WSSG's protest, finding "no legal or factual basis" for WSSG's claim that NAVFAC "failed to perform a price realism analysis in accordance with the RFP" and that "the terms of the RFP did not require a price realism analysis" (R4, tab 12-370.1at MSJ Exhibit 6_1).  On or about May 5,

2014, the government filed its Agency Report in response to WSSG's protest (R4, tab 12-394.1 at MSJ Exhibit 42_1). Among other things, the Agency Report explained that NAVFAC's source selection decision was based on a comparison of the offerors to each other rather than to the IGE "because it recognized that a collective statistical model of the offerors' FTE counts better reflected current market conditions and the approaches employed by the offerors than the IGE did" (*id*. at MSJ Exhibit 42_9). Accordingly, NAVFAC used the IGE for "assessing the upper limits of price reasonableness" (*id*. at MSJ Exhibit 42_22). On or about May 19, 2014, Chugach submitted to GAO its comments on the Agency Report and "endorse[d] without exception the Navy's position" (R4, tab 12-405.1 at MSJ Exhibit 38_1). On or about May 15, 2014, WSSG submitted a supplemental protest (R4, tab 12-403.1 at MSJ Exhibit 40_1). On July 9, 2014, GAO denied WSSG's original and supplemental protests (R4, tab 12-435.1 at MSJ Exhibit 33_1). In its decision denying the protests, GAO stated, in part:

> The Navy reviewed the offerors' technical approach proposals and found that "[w]hile offerors differed in their approaches or methods for meeting the RFP requirements . . . no firm provided an approach or method that was so unique that [it] would noticeably impact staffing due to increased or decreased efficiencies." AR, Tab G-1, SSAC Report, at G7. As a result, the technical team concluded that it was appropriate to compare offerors' proposed FTEs to each other with a standard deviation analysis. *Id*.
> * * *
> On this record, we find that the agency reasonably evaluated [WSSG's] technical approach.

(*Id*. at MSJ Exhibit 33_6-8)

## VI. CFSI PERFORMS THE WSBOS CONTRACT

### A. The Transition Period

After CFSI was awarded the WSBOS contract, but before it began performance, Chugach stood up a transition team led by Robert (Chris) Viramontes, who was CGS' Vice President of Base Operations Support Services (R4, tab 5-6 at 27; R4, tab 6-22 at 2). As part of his transition team duties, Mr. Viramontes conducted a review of the WSBOS Contract and Chugach's proposal (R4, tab 5-6 at 34). Mr. Viramontes tasked Kevin Hargis, CGS Operations Manager, to identify items that Chugach failed to price into its bid and estimate the financial impact of failing to include those items in its bid (R4, tab 6-133 at CFSI128617_1; R4, tab 6-28 at CFSI132774_1-2; R4, tab 5-4 at 41-51, 57-58). As a result of his review, Mr. Hargis

34

projected that Chugach would lose between $4.7 to $5.4 million dollars per year (R4, tab 5-4 at 70-71).  Mr. Hargis believed the impact of the bid misses coupled with the 3 percent learning curve reduction would result in Chugach paying the government to work for the government (*id*. at 77; R4, tab 6-134 at CFSI132904_1).

During his review, Mr. Viramontes also had discussions with Robert Haunton, the operations manager for the incumbent contractor, EJB (R4, tab 5-5 at 27, 52-53).  Chugach had hired Mr. Haunton part-time to assist with the transition and would subsequently hire Mr. Haunton full-time in a management role (*id*. at 34, 52-53).  Mr. Haunton directed Mr. Viramontes to areas of the WSBOS contract's performance work statement that Mr. Haunton believed Chugach failed to adequately address in its proposal pricing (*id*. at 53-55; 65-66).  Mr. Haunton also stressed the "significant planning" Chugach was going to need to manage the conversion to an RCM-based maintenance program, emphasizing that, "[i]n order for us to be ready to support RCM on 01 October '14 we have to have a concrete plan on what we're going to keep from the old PM-centric plan and what we going to run-to-fail or engage in Total Predictive Maintenance strategies" (R4, tab 6-89 at CFSI240939_1).  Mr. Viramontes concluded that CFSI had failed to price certain aspects of the WSBOS contract and underestimated by approximately 80-90 FTEs the staffing level Chugach needed to perform the contract requirements (R4, tab 5-6 at 34, 122-25).  In an email exchange regarding the cost model associated with another Chugach contract in August 2014, Mr. Viramontes wrote: "We both know [Business Development] just arbitrarily cut position to come up with their winning price. I'm seeing the same here at West Sound" (R4, tab 6-63 at CFSI298501_1).

As a result of Mr. Viramontes' review of Chugach's proposal, he increased staffing from the 220 FTEs that Chugach bid for self-performed recurring work, to 307 FTEs, because he "didn't perceive having enough staff to start the job at 220.  So [he] took it to 307 just to get [Chugach] up and running."  Mr. Viramontes attributed this staffing shortfall in part to the option year modifier and in part due to various bid misses.  (R4, tab 5-7 at 64-66)  Mr. Viramontes testified that the decision to increase staffing from 220 to 307 was a decision made by Chugach and was not due to any direction from the government (*id*. at 66-67).  In addition to the hiring of Mr. Haunton discussed above, during the transition period and early stages of performance, Chugach hired many of EJB's productive work force as well as management and supervisory staff.  Chugach also purchased EJB's vehicle fleet, Maximo data, operating procedures, and work plans. (R4, tab 12-458.1 at CFSI251320_1; R4, tab 5-2 at 23; R4, tab 5-5 at 107-08; R4, tab 5-4 at 73-74, 105)

The transition team saved money by using EJB's Maximo data and work plans to populate its own work plans, rather than having to develop their own work plans for things like preventive maintenance (*see* R4, tab 12-451.1 at CFSI18311_3; R4, tab 5-5 at 107-08).

B.  CFSI Performance of the Contract

Chugach began full performance of the WSBOS Contract on October 1, 2014 (R4, tab 5-2 at 43; R4, tab 5-6 at 132-33).  As of the start of performance, Chugach was staffing approximately 305 employees to perform the Recurring work (app. supp. R4, tab 1660 at CSUP66042).  After correcting for work that Chugach bid as subcontractor-performed work, but ultimately self-performed, this staff of 305 is an increase of approximately 80 FTEs above what Chugach proposed (R4, tab 12-338.1, Sheet: FFP Summary at Cell AG91 (indicating 214.79 FTEs excluding subcontractors); R4, tab 12-498.1 at CFSI299179_1; R4, tab 10-1 ¶ 106 (CFSI ultimately self-performed Annex 18, which was bid as 11 subcontractor FTEs); R4, tab 2-39.7 at GOV212643_13).

At the time of award, Chugach did not have Nelson Engineering under subcontract to write and produce the IMP, even though Chugach's proposal stated "Nelson Engineering will develop our contract-specific IMP . . . ." (R4, tab 6-87 at B365; R4, tab 6-72 at CFSI115665_1; R4, tab 5-7 at 62-63; R4, tab 6-96 at CFSI181742_2).  In November 2015, after Chugach realized Nelson Engineering was not actually under contract to develop the IMP, Mr. Hargis informed Mr. Haunton that Chugach was reaching out to Nelson "with an official SOW and RFP for all IMP's called out in [Chugach's] contract" (R4, tab 6-96 at CFSI181742_1; R4, tab 12-726.1 at CFSI16366_6 (admitting that "the development of the IMP's at WSBOSC is an additional service above and beyond" Nelson Engineering's existing contract.)).  In response to Mr. Hargis' email, Mr. Haunton wrote: "All of this just sucks. I'm sure Scott is saying; 'when will the blood-letting ever end at West Sound.'  Believe me when I say that we're working very hard to find ways to not continue this money bath, but it's very hard as [Business Development] screwed this up so bad" (R4, tab 6-96 at CFSI181742_1).

In January 2016, Chugach discovered that not only was Nelson Engineering not under contract to develop the IMP, there was a dispute between Chugach and Nelson Engineering as to the full scope of Nelson's RCM-related work.  Nelson asserted that its contract with Chugach only included RCM analysis, not RCM "implementation" which included not only the revision of "existing PM Job Plans and creat[ing] new PM Job Plans to implement the RCM maintenance program recommendations . . . ." but also "PT&I (predictive testing and inspection), RCM training, facility condition assessments, and capital asset planning" (R4, tab 12-726.1 at CFSI16366_1, 5).  In a PowerPoint presentation dated January 27, 2016, Chugach described the dispute pertaining to Nelson Engineering's scope of work as it related to the "updating and/or creating of PM plans" and "IMP plan development" as "costly" to the tune of "$1.327M additional (unbudgeted) cost to West Sound" (R4, tab 12-728.2 at CFSI24364_1-2, 9).

36

In addition to not having Nelson Engineering under contract to write and produce the IMP, Chugach failed to include approximately $100,000 worth of costs associated with Nelson performing the RCM analysis in its bid (R4, tab 6-96 at CFSI181742_3).  As of March 7, 2016, 17 months into Chugach's performance (the middle of the second claim year), not one IMP had been completed or implemented (R4, tab 6-161 at CFSI301675_1).  Chugach admits that it had not implemented an Integrated Maintenance Program as of the end of FY16 or 30 September 2016 (R4, tab 7-37 at 9-10).  Because it had not yet implemented any IMP or RCM efficiencies, Chugach was following work plans and procedures it had purchased from EJB, the incumbent contractor (R4, tab 6-81 at CFSI23535_20; R4, tab 5-4 at 105; R4, tab 5-2 at 179-80).  Chugach continued to follow EJB's work plans for at least approximately two years (R4, tab 6-81 at CFSI23535_20; R4, tab 5-4 at 99-100, 105-08) and continued performing time-based preventative maintenance which is "very labor intensive" (R4, tab 5-7 at 89-90; R4, tab 6-73 at CFSI115660_1; R4, tab 6-112 at CFSI239913_12 (CFSI presentation to NAVFAC on or about May 16, 2016 stating that "[u]ntil IMP components are submitted and approved, CFSI has no choice but to accomplish all PMs based on the old, inefficient maintenance plans inherited from predecessor" resulting in CFSI being "unable to gain the intended efficiencies of RCM/IMP until halfway through the contract's PoP . . . .")).

Chugach experienced difficulties meeting the performance requirements of the WSBOS contract (R4, tab 6-90 at CFSI184604_1; R4, tab 5-4 at 81; R4, tab 5-9 at 89).  Approximately five months after performance began, Mr. Hargis, in consultation with Mr. Haunton, recommended the hiring of approximately 60 more FTEs to improve Chugach's performance (R4, tab 6-90 at CFSI184604_2; R4, tab 5-4 at 81-87).  By email dated May 15, 2015, Mr. Haunton noted the hours used by Chugach's bid proposal team to calculate the number of FTEs required to perform the workload captured in the WBS "was based on 1,880 hours or a full productive year" (R4, tab 6-92 at 211991_1).  Mr. Haunton believed using 1,880 productive hours per year "is not realistic when calculating actual FTE numbers, whereas an industry standard of between 1,400-1,500 hours would be expected based on myriad categories of non-productive time that impact the [operations area of responsibility] of the West Sound" (*id.*, R4, tab 12-612.1 at CFSI183001_1).

In May 2015, CFSI internally discussed that increasing staffing on WSBOS in order to improve "on time performance," even to the point of operating at a loss, would still be beneficial and profitable to the company in the longer term: "Those highly rated CPAR ratings and the positive reputation that would come from successfully operating the WSBOSC (even at a loss), could lead Chugach to a strong future on future Navy BOS contracts" (R4, tab 12-577.1 at CFSI28518_30).  By sometime in 2016, Chugach, in an effort to meet the performance standards under the WSBOS contract, increased its recurring work staffing to approximately 425 FTEs

(exclusive of subcontractors) (R4, tab 5-5 at 56).  The government did not direct Chugach to increase its staffing (*id.* at 77-78; R4, tab 5-2 at 76-82; R4, tab 5-4 at 83-84, 171-72, 235).

C.  March 2016 "Huntsville" Investigation

In March 2016, as part of Chugach's effort to investigate its difficulties in performing the WSBOS Contract, Daniel Fenza, the President of Chugach, hired Mr. Viramontes, who was no longer a Chugach employee, as a consultant to assist Chugach with the investigation, to include determining what areas of the contract, if any, were underbid by Chugach (R4, tab 6-41 at CFSI24264_1; R4, tab 6-42 at CFSI25872_1, CFSI25874_1-13; R4, tab 5-6 at 13-14, 147-49; 161-64; R4, tab 5-2 at 137-39).

Among other things, Mr. Fenza and Mr. Viramontes discovered that the labor hours assumed in Chugach's proposal for the WSBOS Contract had been reduced by approximately 258,000 hours prior to submission of the proposal (R4, tab 6-83 at CFSI115655_2-3).  The 258,000-labor hour reduction identified by Mr. Viramontes and Mr. Fenza approximates the overall 39% reduction attributable to the option year modifier (R4, tab 6-1 at Cells S7 and T7 (Option Year Modifier reduced the total recurring work Labor Hours from 682,501.91 to 414,101.18); tab 10-1 ¶ 54).  In an email dated March 7, 2016 from Mr. Fenza to Mr. Viramontes, Mr. Fenza states that the 258,000 hours of reductions that took place in the WBS "[are] unaccounted for" and Mr. Viramontes responds that "[g]iven the lack of knowing the basis for reducing the hours this drastically I'm led to believe the cuts were simply arbitrary as a means to get lean and competitive" (R4, tab 6-73 at CFSI115660_1).  In furtherance of the investigation, Mr. Fenza, Mr. Viramontes, Mr. Hargis, and Mr. Williamson gathered in Huntsville, Alabama to discuss Chugach's financial losses on the WSBOS contract (R4, tab 5-9 at 162-64).  Mr. Williamson testified at his deposition that the Huntsville group did not determine the reason for the 40% reduction to Chugach's labor hour assumptions.  He further testified that the speculation of the group was that the reduction was made to make Chugach's bid price more competitive (R4, tab 5-9 at 197, 202).

While in Huntsville, the team assembled by Mr. Fenza compared the IGE FTE and labor hour estimates with Chugach's unmodified FTE and labor hour estimates. The team concluded that the difference between the IGE labor hour estimate and Chugach unmodified labor hour estimate was only 26,872 hours (or approximately 13 FTEs at 2,080 hours per year) (R4, tab 6-139 at VIRA34_1; R4, tab 5-4 at 205-06).

Mr. Viramontes testified that the Huntsville team concluded that the historical data provided in the solicitation for number of trouble calls was not out of tolerance with the number of trouble calls that Chugach received while performing the WSBOS

contract (R4, tab 5-7 at 38; 72; R4, tab 6-67 at 1). While the number of trouble calls experienced by Chugach was not out of tolerance with the historical data provided in the solicitation, Chugach experienced a difference between the hours it estimated for trouble calls and the hours it actually incurred for trouble calls (R4, tab 6-64 at 3-4; R4, tab 5-7 at 37-39). Mr. Viramontes testified that during the Huntsville review, the team noticed that indirect costs for Annexes 15 and 17 seemed "extremely high," which points to an issue with coding, resulting in costs not being charged "to the right category of costs" (R4, tab 5-7 at 81-83).

D. The July 2016 "Tiger Team" and Related Investigations

In July and August 2016, Chugach assembled a "Tiger Team" to further evaluate the causes of its financial losses and performance issues (R4, tab 6-79 at CFSI10224_2; R4, tab 12-1072.1 at CFSI117037_1-2; R4, tab 4-1 at CFSI21902_33). The Tiger Team consisted of "expert and experienced base operations business capture and operations professionals" who "devote[d] significant effort over a two-month period to analyze all aspects of the problem" (R4, tab 4-1 at CFSI21902_33). A "core element" of the Tiger Team's mission was to "research why so many more hours were recorded than expected" (*id.*). The Tiger Team's efforts resulted in over 200 discrete findings (R4, tab 6-142 at CFSI158857_1, 1-17).

On July 26, 2016, Steve Hammock, who had served as a member of the Tiger Team, wrote in an email to James Williamson that one of the biggest issues with regard to WBS reductions was "really part of the overall cost strategy to incorporate more modern RCM-based PM program so not necessarily a 'miss'" (R4, tab 12-1195.1 at CFSI110695_1). On or about August 4, 2016, less than one month before Chugach submitted its certified claim, Mr. Hammock wrote, among other things, that Chugach "lack[ed] an apparent financial control process that establishes budget levels for shops or activities, incorporates control measures, and quickly identifies and corrects budgetary overruns" (R4, tab 6-128 at CFSI110674_1, CFSI110675_1). He also wrote that Chugach "ha[d] not implemented a modern, engineering-based PM program that eliminates legacy maintenance practices and optimizes maintenance actions." He continued, "[i]n my opinion, the most impactful actions are to implement a completely revamped modernized maintenance program." (*Id.* at CFSI110675_1)

On August 12, 2016, James Williamson, another member of the Tiger Team, provided a summary of his individual conclusions to Daniel Fenza and Kevin Hargis, noting that there were "three major issues affecting financial performance at West Sound:" "Flaws in bid strategy," "Government administration of the contract unfavorable to Chugach," and "Poor management controls" (R4, tab 12-1447.1 at CFSI118789_1; R4, tab 12-1447.2 at CFSI118790_1). Mr. Williamson identified several flaws in Chugach's bid strategy, including Chugach's decision to underestimate trouble call hours. He noted that the three-year average of trouble call

hours in the RFP was 77,887 hours per year, but that Chugach's proposal was based on 52,769 hours per year.  (R4, tab 12-1447.2 at CFSI118790_1)  Mr. Williamson wrote that, in his view, poor management controls "is the area that could have the largest impact on financial performance" (*id*. at CFSI118790_3).  Among the issues he noted were a "[l]ack of budgets and budget review" and "[i]mproper coding" (*id*.).  Mr. Williamson concluded his summary by writing, in part:

> At the heart of the issues that afflict the West Sound project is a lack of coordination between business functions at Chugach.  Business Development did not adequately involve Operations in the development of the bid and Operations did not adequately involve Business Development in the startup.  This resulted in executing a plan that was very different from the bid plan.  While there were legitimate concerns about the bid strategy this could have easily been alleviated before the bid by adequate review and input from operations.  Even after the bid much of the financial woes could have been mitigated by a cooperative relationship with business development in executing the project in a manner consistent with the bid strategy.  Unfortunately neither of these occurred and the financial damage has been virtually unmitigated for nearly two years.

(*Id*. at CFSI118790_4)

On or about June 26, 2017, Daniel Fenza, CFSI's President, memorialized in writing his "Lessons Learned from West Sound BOSC" (R4, tab 12-1985.2 at CFSI116818_1).  While not directly tied to the Tiger Team's effort, Mr. Fenza's "lessons learned" drew from the Tiger Team's effort as well as "a variety of research efforts and analyses conducted after the contract's start date of October 2014" (*id*.).  Mr. Fenza noted several lessons learned, including that:

> ☐ CFSI had failed to heed the "danger signs" in the RFP regarding differences between the incumbent contract and the WSBOS Contract.
> ☐ Regarding CFSI's use of the incumbent contractor's job plans, CFSI "failed to realize that as a performance based contract, corrective actions were within our control and should have been addressed during the contract start-up phase."

☐ "Ops failed to realize that NAVFAC wanted a change agent on this contract who would convert the PM program from OEM based to RCM based."

☐ "The initial cost coding structure established on this contract failed to allocate costs in a manner that would serve as an effective management tool or to allow for effective forensic accounting of job losses after the fact."

(*Id*. at CFSI116818_1-2) However, Mr. Fenza testified that the Tiger Team's findings could not explain the differences in labor hours being experienced by Chugach, and that the inefficiencies identified were "minimal" (R4, tab 5-5 at 183).

Beginning in October 2016, after the Tiger Team concluded its investigation and provided its findings and recommendations, Chugach began to reduce staffing, initially by 86 FTEs and then further with subsequent reductions in force (R4, tab 6-142 at CFSI158857_1; R4, tab 6-143 at 3; R4, tab 5-4 at 267-70). Eventually, Chugach reduced its staffing to 280 FTEs (R4, tab 6-108 at 6).

E. NAVFAC Withholds Payment

The WSBOS Contract contained two clauses, 5252.246-9303, CONSEQUENCES OF CONTRACTOR'S FAILURE TO PERFORM REQUIRED SERVICES (OCT 2004) and 5252.246-9304, ESTIMATING THE PRICE OF NONPERFORMED OR UNSATISFACTORY WORK (OCT 2004), which authorized the government to withhold payment for non-performed or unsatisfactory work (R4, tab 3-1 at GOV18541-42). Clause 5252.246-9303, CONSEQUENCES OF CONTRACTOR'S FAILURE TO PERFORM REQUIRED SERVICES stated in part:

The Contractor shall perform all of the contract requirements. The Government will inspect and assess Contractor performance in accordance with FAR 52.246-4, INSPECTION OF SERVICES – FIXED PRICE and the Section E provision entitled GOVERNMENT PERFORMANCE ASSESSMENT. The Government will require re-performance, withhold payment, or seek other suitable consideration for unsatisfactory or non-performed work. When defects can't be corrected by re-performance, the Government may reduce the price to reflect the reduced value of services performed.

41

(*Id*. at GOV18541)  Clause 5252.246-9304, ESTIMATING THE PRICE OF NONPERFORMED OR UNSATISFACTORY WORK stated in relevant part:

> In the event the price of non-performed or unsatisfactory work cannot be determined from the prices set out in the Schedule or on the basis of the actual cost to the Government, estimating methods may be used to determine an amount, which reflects the reduced value of services performed.  The Government may estimate the cost using wage rates and fringe benefits included in the wage determinations included in the contract, Government estimates of the Contractor's overhead and profit rates, and Government estimates of material costs if applicable.

(*Id*. at GOV18542)

On or about June 23, 2015, NAVFAC finalized a Contractor Performance Assessment Report (CPAR) for Chugach's performance from October 1, 2014-March 31, 2015 (R4, tab 11-2 at GOV1723310_1).  The CPAR assigned Chugach a "marginal rating for Schedule (*id*.).

On November 14, 2015, Jim Niles, Administrative Contracting Officer, sent a letter to Joan Mulholland, ACQ Director, Chugach Government Solutions, stating, in part:

> This letter serves as written notice that the Government intends to deduct a portion of the Firm Fixed Price (FFP) invoice payment under the WSBOSC.  This is to compensate the Government for non-performed Preventative Maintenance (PM) work in Annex 1502000, 1602000, 1604000, 1607000, and not completed cross connect inspections, annual utility inventories, and unfilled key personnel identified in the basic contract.  In addition, the Government will begin 10% temporary monthly withholdings due to continued nonconformance of the contract.

(R4, tab 12-632.3 at GOV421048_1)

On November 30, 2015, Thomas Heck, Chugach's project manager, responded to the government's November 14, 2015 withholding letter.  Mr. Heck wrote that "CFSI recognizes and acknowledges the FFP performance shortfalls indicated under [the November 14, 2015 letter].  CFSI concurs with the proposed deducts with the

exception of the following: [] Staffing Deduction for Key Personnel [and] Annual Utility Equipment Inventory" (R4, tab 12-637.1 at GOV54778_1).  Mr. Heck proposed that the amount of the deduct should be $311,733.47.  He also wrote:

> As discussed in weekly partnering meetings with the Government, CFSI continues to apply resources to remedy the performance trends that resulted in these deductions. As also discussed, we are having difficulties recruiting and hiring High Voltage, Low Voltage, and HVAC/R technicians as we are just not getting applicants.  Further, since May 2014, CFSI has expanded staff from 307 to 380 personnel.  Accordingly, CFSI will continue to support the Government in a quality manner.

(*Id*. at GOV54778_3)

On or about January 7, 2016, the government finalized a CPAR for Chugach's performance from April 1, 2015-September 30, 2015, again assigning Chugach a marginal rating for Schedule (app. supp. R4, tab 1428 at CSUP49927-28, 31).  In its response to the CPAR, CFSI stated in relevant part:

> Although unfilled key positions were contract requirements, other members of the Management Team stepped up to cover those Areas of Responsibilities (AORs).  CFSI does not believe, in it's entirety [sic], that untimely work completion and lower quality deliverables were a result of these vacancies, the real issue in our view is our inability to find qualified applicants for our critical hourly positions.

(*Id*. at CSUP49930-31)

On November 14, 2015, the government notified Chugach that it intended to withhold a portion of the firm-fixed-price invoice due to non-performed work (R4, tab 12-632.1 at GOV421046_1).  In a response dated November 30, 2015, Chugach generally agreed with the specific deduction amounts (R4, tab 12-641.2 at GOV389012_1-3).  On February 2, 2016, the government issued unilateral contract modification no. A00003 formalizing a deduction of $439,353 for additional nonperformance of FY15 work (R4, tab 3-26 at GOV18659-60).  The government prepared and Chugach commented on a CPAR for Chugach's performance from February 1, 2016-September 30, 2016 (R4, tab 11-6 at GOV1723325_1).  The CPAR assigned an unsatisfactory rating to Chugach for schedule and also for management (*id*. at GOV1723325_2).  With respect to Chugach's performance during the review

43

period, the CPAR (February 1, 2016-September 30, 2016) stated:  "CFSI failed to meet contract specified completion timeframes for Service Trouble Calls, Bullets (small scope repair/renovation projects), and their scheduled dates for Preventative Maintenance (PM) of equipment in the BUMED Facility Investment (1502010), Facility Investment (1502000), and Utilities (1600000) Annexes."  "CFSI failed to submit 35% of the deliverable reports per Section F of the contract."  "Vacant Key Positions this performance period included; Utility Manager vacant since October 2014 was filled February 2016.  Utility Supervisor vacant since February 2015 was filled September 2016."  (*Id*. at GOV1723325_2-3)  NAVFAC reduced its FY16 withholdings for unsatisfactory (late) and nonperformed FY16 work from 10% to 5%:  "In June [2016] the amount of late work decreased.  As a result the Administrative Contracting Officer (ACO) released 40% of prior withholdings and decreased monthly withholding to 5% from 10% on CFSl's monthly invoices.  The ACO continued withholding 5% due to the remaining incomplete work" (*id*. at GOV1723325_3).

Chugach admitted it was not fully performing the FY16 recurring work (gov't ex. 8 at CFSI161578_1).  Mr. Hargis, in responding to a CPAR for period of October 2015 through January 2016, indicates, "CFSI recognizes the impact that late work has on the overall mission readiness of WSBOSC customers and has implemented strategies to improve our 'On Time Performance' metrics'" (R4, tab 11-4 at GOV1723317_4).  During the entirety of FY16, NAVFAC withheld 5% of the recurring invoice amounts based upon the government's determination that Chugach had not performed or not performed satisfactorily certain FY16 work (R4, tab 11-6 at GOV1723325_3; R4, tab 12-2100.2 at CFSI292068_1).  The 5% withheld was NAVFAC's estimate of the value of the non-performed and unsatisfactory work in FY16 (gov't ex. 1 ⁋ 20).  As the government began withholding 5% in June 2016, it made the determination before FY2016 performance was complete.

VII.  CFSI'S CERTIFIED CLAIM

On May 27, 2016, representatives of the government and Chugach met to discuss Chugach's assertions that it had omitted costs in its bid, some elements of which it believed NAVFAC should have known during proposal evaluations, and that some terms of the contract as interpreted post award were causing CFSI to expend more costs in materials and labor than were included in its price proposal (app. supp. R4, tab 1446 at CSUP50017).  Chugach requested that NAVFAC consider an adjustment to the contract price (*id*.).  By letter dated June 7, 2016, Audrey Fitzgerald, Contracting Officer, responded to Chugach's informal request for a contract price adjustment indicating that NAVFAC did not find any evidence that the Government should have known of any bid mistakes prior to award (*id*.).  She closed the letter by stating: "[t]he Government provided in the RFP a list of historical service calls to help offerors estimate the effort and scope of trouble calls that it may receive each year and

44

to use that data to build its proposal.  Should Chugach discover that there is significantly greater effort to perform trouble calls under its contract than the historical data would indicate, the Government would give proper consideration to a request for equitable adjustment to the price of the contract" (*id*. at CSUP50020).

Rather than submit a request for equitable adjustment, on September 2, 2016, Chugach submitted a certified claim for $12,174,903.61, representing losses it allegedly incurred in FY15 as a result of either NAVFAC's alleged failure to disclose "vastly superior knowledge needed to project the level of effort and cost required to perform" or the parties' mutual mistake that the WSBOS Contract could "be performed by a workforce of a similar size [as EJB]" (R4, tab 4-1 at CFSI21902_4-5, 45).  Chugach developed its claim using its integrated accounting system, known as Lawson, to allocate its management and administration costs across the other annexes (app. supp. R4, tab 1657 at CSUP65931-61; R4, tab 7-11 at 3-4) and then calculating the difference between its proposed and incurred costs, and then backing-out its acknowledged bidding mistakes (R4, tab 12-1516.1 [native], app. ex. 12 at 4-5).  Chugach asserted in its claim that its losses stemmed solely from these preaward acts or omissions:

> CFSI has several credible and compelling legal theories to establish that it is entitled to an adjustment in the Contract price, and they are all derived from the way that the Navy negotiated the WSBOSC.  But simply put, the parties did not achieve a valid meeting of the minds during contract formation.

(R4, tab 4-1 at CFSI21902_6)

On February 6, 2017, CFSI revised its claim to include FY16 costs of $22,205,406.60 and withholdings of $1,663,634.80 for nonperformance of FY16 work (R4, tab 4-43 at GOV29286).  With this revision, Chugach's total claim amount increased to $36,043,945.01 (*see id*.).  On July 28, 2017, Eileen Mitchell, Chief of the Contracting Office, issued a Contracting Officer's Final Decision denying Chugach's certified claim, as revised, in its entirety (R4, tab 4-44 at GOV29306).

Contracting Officer's Representative, Keith Sandoval, performed an analysis of Chugach's claim.  Mr. Sandoval noted that Chugach reported an increase in trouble calls and hours spent on those calls, as compared to the number of calls and hours reported by EJB  (App. supp. R4, tab 1523.01 at CSUP64641; app. ex. 4 at 198-99)  In a December 21, 2017 email, Mr. Sandoval shared his analysis of trouble calls with other Navy employees (app. supp. R4, tab 1557 at CSUP65565).  Chugach cites to this email for the proposition that Mr. Sandoval "believed that there were 'grounds for an REA'" (app. proposed finding of fact ¶ 344 (quoting app. supp. R4, tab 1557

45

at CSUP65565)).  However, Mr. Sandoval's comments, read in their entirety were obviously sarcastic:

> This is not true.  Trouble call details, including labor hours, were identified in attachment J-150200-06.  FY09-FY11 historic average was 77,887 hours for trouble calls, including equipment repairs not under ICMR.  CFSI final proposal was 71,456 hours, not including ICMR (no breakout in the proposal).  Show me how significantly greater the effort to perform trouble calls was than historical average, CFSI.  Oh, wait, CFSI, do you want me to do that for you?  OK, that was 101,364 hours in FY15 and 102,103 hours in FY16.  Thank you for the trouble call report.  Seems like grounds for an REA to me!  You're welcome, CFSI.

(App. supp. R4, tab 1557 at CSUP65565)  However, Chugach cites to Mr. Sandoval's deposition testimony that the increase in trouble calls from the historical average would form the basis of a claim, but that he could not provide a conclusion because Chugach had not provided supporting documentation as support for its claim (app. ex. 4 at 199-200).  Mr. Sandoval testified that Chugach had proposed less trouble calls than the historical average but actually performed more trouble calls than the historical average.  Mr. Sandoval noted the change to unlimited service calls, and indicated that Chugach "should take into consideration [that the solicitation included unlimited service calls] and price it – price and risk it accordingly or propose with some risk accordingly." (*Id.* at 199)  Although Mr. Sandoval believed that Chugach should have proposed at least the number of service calls as the historical average, he also was of the opinion that the level of service calls was high enough to provide the basis for a claim (*id.* at 200).  In response, the government submitted an affidavit by Mr. Sandoval controverting Chugach's proposed factual finding and stating that Mr. Sandoval's determination was that Chugach "did not provide enough information for its claims to be analyzed, and that he was "unable to draw any substantive conclusions from the comparison" without additional supporting documentation (gov't ex. 1 ¶¶ 22-23).

VIII.  Chugach Appeals To The Board

A.  Chugach's Complaint

On September 11, 2017, Chugach filed a timely notice of appeal with the Board. On or about October 5, 2017, Chugach filed its complaint in ASBCA No. 61320.  In addition to repeating the certified claim's allegations of superior knowledge (Count II) and mutual mistake (Count III), the Complaint alleged that the

government negligently negotiated (Count I) and constructively changed (Count IV) the WSBOS contract, breached the covenant of good faith and fair dealing (Count V), and improperly withheld payments from CFSI (Count VI).

B.  Discovery Disputes Regarding Historical Information

Following a discovery dispute, the Navy filed a motion to compel Chugach to respond to the government's Interrogatory No. 11 (Order dtd. Apr. 1, 2019, at 2).  The interrogatory provided:

> For each MAXIMO data field identified in CFSI's Supplemental Response to Interrogatory No. 2 as "containing information that CFSI contends constitutes superior knowledge", state for which specific contract annex and SLIN the information in the data field is vital knowledge of a fact affecting CFSI's estimated/proposed/bid cost or duration of performance, and describe how, why, and the extent to which CFSI's bid pricing for that annex and SLIN would have been different had CFSI possessed the information contained in the data field."

(R4, tab 7-17 at 3)  On April 1, 2019, the Board entered an order stating, in part:

> As the MAXIMO database apparently contains between 1 and 2 million records, the Navy is entitled to identification of the specific records Chugach contends to be relevant. To the extent Chugach's claim depends upon the database in general and is not limited to specific data records, it should supplement its response to indicate this.

(Order dtd. Apr. 1, 2019, at 3)

On May 1, 2019, CFSI provided a supplemental response to Interrogatory No. 11, stating, in relevant part:

> In light of the Board's April 1, 2019 order, we now interpret Interrogatory No. 11 as seeking an "identification of the specific records Chugach contends to be relevant" to its superior knowledge claim.  CFSI contends that the database as a whole is relevant.  The database provided the Navy with superior knowledge not necessarily because of the contents of any one row, but because it gave the Navy

47

the ability to query the aggregate of records, using the data fields identified in Response to Interrogatory No. 2, to identify historical metrics and trends that were relevant to estimating the level of effort. As the individual responsible for developing the IGE explained, "actual data" is preferable and "the bigger the database the better the data." Williams Deposition Tr. 170:16-171:4.

(Gov't ex. 9 at 6)

In response to Chugach's Supplemental Response to Navy Interrogatory Nos. 10 and 11, the Navy filed a supplemental motion to compel Chugach to comply with Board's Apr. 1, 2019 Order and respond to Interrogatory No. 11 (Order dtd. May 24, 2019 at 1).  On May 24, 2019, the Board denied the Navy's Supplemental Motion to Compel.  The Board also, however, clarified that Chugach is bound by its discovery response that it is not relying on specific individual records to support its claims in this appeal:

Chugach is bound by its discovery responses, and we interpret its response to interrogatory No. 11 as providing that the entire MAXIMO database is relevant and that it is not relying upon specific individual records.
[…]
Depending on the evidence adduced at a hearing, Chugach's demonstration that the Navy had access to the MAXIMO database and an "ability to query the aggregate of records" may not be sufficient to establish that there was a "conscious omission to share superior knowledge [the Navy] possesses." Thus, without deciding here whether Chugach's reliance upon its theory that the Navy's access to the MAXIMO database as a whole is adequate to establish its superior knowledge claim, if Chugach fails to identify with specificity the superior knowledge contained therein, it will bear whatever consequences that its decision entails.  With this in mind, we find that Chugach has complied with the Board's April 1, 2019 order and deny the government's motion to compel.

(Order dtd. May 24, 2019, at 2-3)

In addition to written discovery, the Navy attempted to obtain testimony regarding what specific information Chugach believed should have been disclosed by NAVFAC. Mr. Hammock, as Chugach's corporate designee, testified that it wasn't

48

"able to conduct a complete analysis of the history of maintenance activities" such that it prepared its bid "without the understanding of the actual condition or the history of what had been done to that plant [facility]" (R4, tab 5-10 at 133-34, 136 (testifying that CFSI was lacking knowledge of "the condition of the facilities and the historical maintenance")). Mr. Crosta, the lead cost estimator on the proposal team did not identify any specific information that he believed NAVFAC should have disclosed prior to award (R4, tab 5-1 at 94-95, 98). Similarly, Mr. Watts, who had primary responsibility for estimating Chugach's staffing requirements did not identify any specific information that he believed NAVFAC should have disclosed prior to award (R4, tab 5-8 at 140-42).

C. Dispositive Motions

On July 16, 2018, the Board granted the Navy's opposed motion to amend its answer to plead the affirmative defenses of estoppel and waiver. *Chugach Federal Sols., Inc.*, ASBCA No. 61320, 18-1 BCA ¶ 37,111 at 180,620 (*Chugach I*). On April 10, 2019, the Board denied the Navy's motion for partial summary judgment and granted Chugach's cross-motion for summary judgment, the latter of which resulted in dismissal of the Navy's affirmative defenses of estoppel and waiver. *Chugach Federal Sols., Inc.*, ASBCA No. 61320, 19-1 BCA ¶ 37,314 at 181,496 (*Chugach II*). On May 16, 2019, the Board denied the Navy's motion to dismiss Counts I, III, IV, V, and VI. *Chugach Federal Sols., Inc.*, ASBCA No. 61320, 19-1 BCA ¶ 37,380 at 181,720 (*Chugach III*). On May 27, 2020, the Board granted the Navy's motion for summary judgment as to Count V, and denied the Navy's motion for summary judgment as to Counts I, II, III, IV, and VI. *Chugach Federal Sols., Inc.*, ASBCA No. 61320, 20-1 BCA ¶ 37,617 at 182,597 (*Chugach IV*).

DECISION

By request of the parties, this appeal is being decided pursuant to Board Rule 11, "Submission Without a Hearing." Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board "may make findings of fact on disputed facts." *DG21, LLC*, ASBCA No. 57980, 15-1 BCA ¶ 36,016 at 175,909 n.1; *aff'd DG21, LLC v. Mabus*, 819 F.3d 1358 (Fed. Cir. 2016); *Grumman Aerospace Corp.*, ASBCA No. 31585, 92- 3 BCA ¶ 25,059 at 124,886 n.13 (Kienlen, J. dissenting).

I. Superior Knowledge

We begin with Chugach's superior knowledge claim. Chugach argues that the government should not be allowed to "withhold vital information and negotiate for low staffing levels to reap the benefit of lower prices, just to turn around and insist on far higher staffing levels at the contractor's expense during performance" (app. br. at 1).

49

Chugach contends that the government failed to disclose three categories of superior knowledge:  historical workload data reflecting the costs required to perform the predecessor contract; past practices whereby the government suppressed demand for work under the predecessor contract; and, the technical team's finding that Chugach did not propose enough personnel to meet the contractual demands (*id*. at 142).  The government asks that we strike certain of Chugach's arguments regarding the historical workload data because Chugach failed to identify the arguments in response to multiple discovery requests (gov't resp. at 7-9).  In addition, the government contends that it did not withhold any superior knowledge; that the Navy did not suppress demand for service calls; and that the evaluation team did not conclude that Chugach could not perform the contract with the proposed staffing (gov't resp. at 12-32).  Finally, the government contends that Chugach cannot establish that the alleged undisclosed information affected its cost of performance because of problems caused by its own business judgment (gov't resp. at 32-41).  We consider Chugach's alleged categories of superior knowledge sequentially.

## A.  The Legal Standard For Superior Knowledge

As a general rule, a contractor performing a fixed-price contract assumes the risk of unexpected costs.  *See, e.g., Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 777-78 (Ct. Cl. 1963).  However, the government has an implied duty to "disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."  *Scott Timber Co. v. United States,* 692 F.3d 1365, 1373 (Fed. Cir. 2012) (quoting *Giesler v. United States,* 232 F.3d 864, 876 (Fed. Cir. 2000).  Superior knowledge generally applies when:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994) (quoting *American Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981)).

## B.  Historical Workload Data

Chugach's main argument is that the Navy failed to disclose superior knowledge in the form of historical workload data generated by the incumbent contractor, EJB (app. br. at 142).  Specifically, Chugach points to reports that EJB provided to the Navy during performance of predecessor contract (*id*.).  However,

50

Chugach fails to identify information possessed by the Navy that constitutes "vital knowledge of a fact that affects performance costs or duration."  *Hercules, Inc.*, 24 F.3d at 196.  Instead, Chugach points to information possessed by the Navy and speculates that knowledge of this information was the reason for the differences between the government's IGE and Chugach's bid.  Chugach fails to identify *specific information* that would have affected its "performance costs or duration."  Instead, Chugach simply points to the difference between its bid and the IGE.  This argument fails for two reasons.  First, the Navy established that the IGE was prepared based on projections made by Navy employees, and not solely historical data (although the Navy did use some data not provided to Chugach).  Second, other bidders that participated in predecessor contracts submitted bids similar to that of Chugach.  Chugach fails to explain how the bidders possessing this "vital knowledge" did not submit different bids.  Third, Chugach did not perform the contract consistent with its proposal.

Chugach asserts that EJB provided to the Navy information pertaining to trouble calls, bullets, and preventative maintenance actions, but that the Navy did not provide all this information to bidders (app. br. at 142-47).  For trouble calls, the Navy provided what it considered to be the relevant information including the description of the call, the location, labor hours, cost threshold, and work type (app. supp. R4, tab 103.02 [native]).  However, the Navy omitted data such as the date the Navy requested the work, the date EJB completed the work, the piece of equipment being repaired, the cost of materials, and subcontractor costs (app. br. at 143).  For maintenance, Chugach contends that the government withheld all information other than the inventories of equipment to be maintained (*id*. at 145).  The Navy did not provide more information because of the change to the new IMP maintenance procedure.  Chugach additionally identifies four specific service calls as evidence of superior knowledge.  The first record (#3453054) shows that EJB incurred costs above the contractual liability limit of $2,000 on the predecessor contract (*id*. at 23, 146).  From this single data point, Chugach speculates that the "undisclosed material costs would have revealed significant material costs, including some instances where the material costs exceeded the full liability limit under the previous EJB Contract" (*id*. at 146).

Chugach cites to a second record (#3221559) as evidence that subcontractor costs could exceed the liability limit (*id*. at 23, 146).  Chugach again speculates from this single record that bidders would need the missing information to understand the full volume of work, and that "[i]n some cases, that would significantly alter the offeror's understanding of the work" (*id*. at 146).

Chugach additionally cites to EJB data demonstrating that EBJ took longer to complete service calls than permitted under the contact on more than 20% of the work (*id*. at 23-24).  Chugach speculates that the "ordering and completion dates would have

given additional context to . . . the difficulties of staffing these requirements to meet fluctuating demand" (*id*. at 146).  Chugach also points to the fact that EJB's data are missing the equipment number for many of the repair calls, and, thus, much of the workload is to repair items for which the contractor does not have maintenance responsibility (*id*. at 24).  Chugach speculates that this information is essential to determine the contractor's ability to decrease demand through more effective maintenance (*id*. at 147).

We find that the information identified by Chugach does not constitute superior knowledge with regard to the WBOS solicitation.  We hold that Chugach has not established by a preponderance of evidence that the information identified was "vital knowledge of a fact that affects performance costs or duration."  While Chugach argues that the identified information would have affected its performance costs, we do not find that the limited information identified by Chugach was "vital" to determining its bid.  First, and most significantly, we find that the identified information is too limited to constitute "vital" facts.  Chugach has identified two individual records that it contends contain errors out of 1,972 pages of historical data that was provided to bidders.  In addition, Chugach identified two data fields that were not provided to bidders that it speculates would have influenced its bid.  However, Chugach fails to demonstrate how knowledge of this information would have influenced its bid.  In fact, Chugach seems to be unable to explain how its bid was formulated.  Because we determine that Chugach has not established the existence of vital factual information, we do not reach the government's argument that Chugach has not established that the superior knowledge was responsible for its financial losses on the contract (gov't resp. at 32-41).  However, we do note Chugach's inability to explain how its bid was formulated in determining that Chugach has not established that the factual information was vital.

Second, even if knowledge of this information could have been vital in bidding for the existing WBOS contract, Chugach fails to address how this would be vital information for the new WBOS contract.  Specifically, Chugach points to information regarding bullets that exceeded the $2,000 limit in the existing EJB WBOS contract (app. br. at 23, 146).  However, the new WBOS contract had a $5,000 limit.  In addition, much of the information regarding maintenance on equipment without equipment numbers ignores that the new WBOS contract under bid had an entirely different maintenance requirement.

With regard to the second factor for superior knowledge, that the government was aware that Chugach had no knowledge of and had no reason to obtain such information, the government demonstrates that Chugach, as an established BOS contractor should have known the types of information that existed (gov't resp. at 20-22).  Moreover, the Navy notified bidders of the significant changes to the contract.

C.  The Navy's Purported Suppression of Demand

Chugach additionally identified the Navy's purported suppression of demand for services as an example of superior knowledge (app. br. at 150-53).  According to this argument, the Navy required more service calls during performance of the EJB base services contract, but was unable to agree to a price, and that the Navy therefore "metered" its service calls to avoid exceeding the number of calls required by the contract.  In addition, Chugach argues that the Navy prohibited EJB from identifying items that needed to be repaired through trouble calls (app. br. at 150-51).

As the government notes, the data are from the EJB contract.  However, the contract at issue differed from the EJB contract in that the number of service calls was unlimited (gov't resp. at 24).  Despite repeated cautions in the solicitation, and in discussion questions, warning bidders to account for this significant change (R4, tab 1- 14.2 at GOV17267; R4, tab 6-120 at CFSI256231_30, 44; R4, tab 2-43.1 at GOV475171-72) Chugach contends that it was unclear whether a change to unlimited service calls would result in an increase or decrease in the number of service calls (app. br. at 151-52).  Chugach's argument is contrary to the most basic principles of economics—it is undisputed that demand will increase when the price of an additional unit is essentially set to zero.  *See, e.g.*, Adam Smith, *An Inquiry Into the Nature and Causes of The Wealth of Nations* 62-63 (Modern Library ed., Random House 1937) (1776).  Chugach's employees recognized this simple economic fact (R4, tab 5-4 at 141 (change to unlimited trouble calls "incentivized" Navy customers to call in more trouble calls "because there's no limit," in contrast to the EJB contract, under which those customers "were disincentivized because they had to pay for [extra trouble calls]"); (R4, tab 5-7 at 75-76) (unlimited number of trouble calls makes the WSBOS contract more risky than the EJB contract); R4, tab 5-10 at 31-33 ("unlimited" trouble calls created risk of increase in workload "much greater than historical")).

Given the change in the structure of the contract, we hold that the purported suppression of demand, even if proven, was not vital factual information that would increase Chugach's costs or performance time.  Moreover, the solicitation clearly and specifically notified bidders that there were changes to the treatment of service calls, both in number and financial limit.  Chugach relies upon the holding in *Tripod, Inc.*, ASBCA No. 25104, 89-1 BCA ¶ 21,305 for the proposition that the government's knowledge that workload data provided was understated would constitute superior knowledge (app. br. at 151).  In *Tripod*, the government failed to notify bidders of a longstanding obligation to provide a special lunch (the Mexican meal) each week.  The Board found that the special lunch involved additional time and effort and was more heavily patronized, relative to other lunch services.  *Tripod*, 89-1 BCA ¶ 21,305 at 107,438.  The Board ultimately held that Tripod was entitled to compensation for the additional costs of providing the special meal, because it would be unreasonable to

expect bidders to ask the government for the master menu or to inquire if there were any special meals that were not disclosed.  *Id*. at 107,444.  As an initial point, it is not even clear that *Tripod* is a superior knowledge case.  The opinion notes that the appellant argued superior knowledge, but the Board does not cite or apply the standard for a superior knowledge claim.  *Id*.  Rather, it appear that the Board considered this to be a contractual change.  Regardless, even if the Board did base its award in *Tripod* on the existence of superior knowledge, the case is factually distinct from this appeal.  In *Tripod*, the requirement for the special meal continued from the existing contract to the new contract.  Here, the contract substantially changed the requirements for service calls.

### D.  The Navy's Purported Knowledge That Chugach Would Not Be Able to Perform the Contract With Its Proposed Staffing

Chugach's final allegation of superior knowledge is its contention that the government knew that Chugach would not be able to perform the contract with its proposed staffing.  According to Chugach, the government prepared its IGE based, in part, on the EJB workload data that the Navy did not provide to bidders.  According to Chugach, the fact that its proposal provided for substantially fewer full-time-equivalent employees, means that the government knew that Chugach could not perform the contract with its proposed staffing.  (App. br. at 153-55)

As the government notes, Chugach's argument treats the IGE as the "known" minimum staffing requirements for the contract (gov't resp. at 14-18).  In fact, the IGE is a projection made by the government, incorporating discretionary judgments by a number of government employees.  For example, one of the key drivers in generating the IGE was the estimate of the number of labor hours per service call.  Chugach contends that the government "knew" that the number of hours per service call would be higher in the new contract based upon undisclosed data from the incumbent contractor EJB.  However, the EJB data show no such thing.  Rather, the government estimator made a projection that the number of hours per service call would double from roughly 3.3 hours per service call experienced by EJB to 6.6 hours per service call (gov't ex. 2 ¶ 18).  There was nothing in the EJB data to indicate such an increase.  In addition, it appears that the government projection overestimated the impact of the contractual changes, because Chugach did not incur 6.6 labor hours per service call (R4, tab 10-1 ¶ 117).  The fact that the government's staffing estimate was ultimately more accurate than Chugach's projection does not make it superior knowledge.  As noted in *Northrop Grumman v. United States*, 47 Fed. Cl. 20, 90 (2000) a difference in technical judgment or prediction between the government and a contractor is not a "fact" that affected performance cost or duration and, therefore, does not support a superior knowledge claim.  We hold that the staffing levels assumed in the government's IGE do not constitute "vital knowledge of a fact that affects

54

performance costs or duration."  Rather the IGE is a projection, and not a "fact."  The contract specifications pointed Chugach to the changes in the new contract.

## II.  Negligent Negotiation (Violation of FAR 15.306(d)

Count I of Chugach's complaint alleges that the Navy engaged in "negligent negotiations" when it violated FAR 15.306(d) by failing to meaningfully discuss with Chugach its concerns that Chugach had underestimated the necessary staffing.  The government previously moved to dismiss the negligent negotiations claim for lack of subject matter jurisdiction.  Under the standard of review for a motion to dismiss, we denied the government's motion, finding that Chugach had made jurisdictional allegations sufficient to survive the motion to dismiss.  Additionally, we noted that "Chugach's negligent negotiations claim is actually, for all intents and purposes, really just an element of its superior knowledge claims . . . ."  *Chugach III*, 19-1 BCA ¶ 37,380, at 181,719.  That is, that Chugach was alleging that the government had superior knowledge regarding necessary staffing levels that it did not disclose during contract negotiations.  We held above that Chugach had not demonstrated the existence of vital knowledge of a fact that affects performance costs or duration information, thus we deny Chugach's negligent negotiations claim to the extent it asserts that the government possessed superior knowledge.[6]

Chugach also contends that a violation of FAR 15.306(d) provides an independent basis for recovery, because the regulation exists for the benefit of contractors (app. br. at 125-26).  The government contends that FAR 15.306(d) provides contractors with the fair opportunity to compete for an award, and does not address the harm -- unprofitable performance -- alleged by Chugach (gov't resp. at 44-47).

We previously held that FAR 15.306(d) existed, at least in part, for the benefit of contractors.  *Chugach III*, 19-1 BCA ¶ 37,380 at 181,718-19 (citing *LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1552 (Fed. Cir. 1995)).  However, as explained below, we hold that Chugach has not demonstrated a violation of the FAR provision.

Pursuant to Federal Acquisition Regulation (FAR) 15.306(d), "Exchanges with offerors after establishment of the competitive range:"

> Negotiations are exchanges, in either a competitive or sole
> source environment, between the Government and
> offerors, that are undertaken with the intent of allowing the

---

[6]  Thus we need not reach the question of whether a cause of action based on negligent negotiations can provide a remedy when a contractor is unable to satisfy the four elements of a superior knowledge claim.

offeror to revise its proposal.  []  When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

. . .

(2) *The primary objective of discussions is to maximize the Government's ability to obtain best value*, based on the requirement and the evaluation factors set forth in the solicitation.

(3) At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.  []  The scope and extent of discussions are a matter of contracting officer judgment.

FAR 15.306(d) (emphasis added)

Chugach asserts that the Navy violated FAR 15.306(d) when it did not meaningfully discuss its concerns that Chugach had underrepresented the necessary staffing such that the Navy did not believe that Chugach could perform the contract (app. br. at 127-37).  However, the government contends that it fully complied with FAR 15.306 (gov't reply at 47-62).  Chugach alleges that it is entitled to relief upon demonstrating that i) the FAR provision exists for the benefit of the contractor; ii) the government violated the FAR provision; and iii) the violation harmed the contractor (app. br. at 124, citing *LaBarge Prods.*, 46 F.3d at 1552).[7]  Here, we have already held that FAR 15.306 exists, at least in part, for the benefit of the contractor.  Turning to the second factor, the parties dispute whether the government violated FAR 15.306(d).  Both Chugach and the government cite to decisions by the Government Accountability Office and the United States Court of Federal Claims applying FAR 15.306(d) in the context of bid protests (app. br. at 128; gov't resp. at 48-49).  Chugach cites to decisions requiring that the government conduct discussions that are meaningful and not misleading (app. br. at 128 (citing *ACS Gov't Sols. Grp., Inc.*, B-282098, 99-1 CPD ¶ 106 (Comp. Gen. June 2, 1999)).  Conversely, the government contends that it did comply with FAR 15.306 by directing Chugach to the areas of concern in its proposal (gov't reply at 47-62).

---

[7] *LaBarge* does not explicitly state such a rule, but as a general proposition, any appeal must demonstrate a violation of a contact term, law, or regulation and harm.

It is undisputed that in August 2012, the government technical evaluation team assigned Chugach a significant weakness regarding its proposed staffing levels for annexes 020000, 150000, 160000, and 180000 in its first proposal revision (R4, tab 2-42.2 at GOV474788).  In fact, the same report assigned 8 of the 9 offerors the same significant weakness (*id*. at GOV474788, GOV474813, GOV474839, GOV474863, GOV474888, GOV474915, GOV474940, GOV474989).  The technical evaluation and price evaluation reports both went through the Source Selection Advisory Council to the source selection authority (the Contracting Officer).  The next month, in September 2012, the SSAC recognized the disparity between the IGE and the proposals of 8 offerors, and indicated that the IGE could be at fault, or the offerors might be attempting to position themselves for award, or that the offerors might be planning on improved and more efficient work practices.  (R4, tab 2-42.4 at GOV1722546)  The SSAC concluded that the wide range of proposed FTEs "is an indicator that offerors should be prompted to review the performance work statement to ensure their proposals include the level of effort required" (*id*.).  Thus, while the technical team found a significant weakness, the SSAC, which reviews the technical and price team reports, found that there was a concern with the staffing levels, but fell short of identifying it as a weakness.

Following these evaluations, in November 2012, the Navy issued discussion questions to the offerors, including Chugach.  Here, the Navy brought attention to the issue by requesting that Chugach "ensure your work hour estimates and FTE staffing for these annexes has adequately addressed no limitation to trouble call quantities, the increased requirements of the RFP (over historical) maintenance program including IMP, and environmental services specifically hazardous waste management" (R4, tab 2-42.5 at GOV474585).  This satisfies the FAR's requirement that the contracting agency direct the bidder's attention to the area of concern.  *See, e.g.*, *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000); *see also*, *ORCA Nw. Real Estate Servs. v. United States*, 65 Fed. Cl. 1, 9 (2005) ("The substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses").  Chugach contends that the Navy's question was inadequate to put it on notice of the significant weakness, because the question did not identify that the concern was the proposed hours were low or significantly low (app. br. at 131).  We disagree.  The discussion question asks Chugach to make sure the work hour estimates and staffing reflect the no limitation to trouble calls and the increased requirements of the new contract as compared to the historical trouble call data (R4, tab 2-42.5 at GOV474585).  While Chugach contends that this could reflect a proposal that was too high or too low, we do not see how references to "unlimited" service calls and "increased requirements" could reasonably be interpreted as telling the contractor that its bid was proposing too much staffing.  Chugach similarly cites to deposition testimony from a Navy witness who was a member of the SSAC, agreeing with Chugach's question that the Navy's question did not "clearly signal that [Chugach has] a significant weakness" (app. reply

at 20 (citing app. ex. 8 at 128)).  However, we do not find testimony by a member of the SSAC, six years after the events at issue, to predominate over the plain meaning of the document.  The testimony of the contracting officer that denied Chugach's claim, and who was not a member of the SSAC that issued the discussion questions, is even less probative (app. reply at 20).

Even if the initial discussion questions were not enough to satisfy FAR 15.306(d), Chugach's argument ignores the Navy's determination that the IGE was too conservative, that the proposals should be compared to each other, rather than to the IGE, and that Chugach's proposal did not have a weakness (R4, tab 2-43.4 at GOV1202881).  Chugach submitted a third proposal revision (R4, tab 2-30.3 at GOV212713_1).  Upon review of the third proposal revision, the Navy issued a third set of discussion questions specifically noting that Chugach's FTE's for certain annexes "appear low" and again asking Chugach to review its staffing (R4, tab 2-44.4 at GOV7474553).  Once again, these discussion questions directed Chugach to the areas of concern, consistent with the requirements of FAR 15.306(d).  In the end, Chugach's technical proposal was rated "good" following discussions (R4, tab 2-45.2 at GOV475514).  Chugach attempts to evade the impact of these later discussion questions by arguing that the Navy's later steps "only preserved the harm" (app. reply at 27) and argues that the SSAC's decision to rely on a price comparison between offerors was unreasonable (*id*. at 28-34).  If we were to accept Chugach's argument that discussion questions following a proposal revision "only preserve[] the harm" it would make the entire proposal review process irrelevant.  Rather, the requirement is simply that offerors be provided with a chance to remedy any significant weaknesses.  *ORCA NW Real Estate*, 65 Fed. Cl. at 9.  Further, we find no evidence that the decision to rely upon a price comparison between offerors to be unreasonable.  Chugach points to a number of purported statistical errors in the evaluation process; however, here Chugach's argument becomes internally contradictory.  Chugach simultaneously contends that the government cunningly took advantage of its superior knowledge of the true cost of performing the WBOS contract to entice contractors into underbidding the contract to the financial benefit of the government while simultaneous contending that the government employees performing the price analysis were incompetent.  As we have already held that the government did not possess superior knowledge, any statistical errors were simply errors and not negligent negotiations.  Moreover, we note that Chugach previously endorsed the government's statistical analysis before the GAO (*see* R4, tab 12-394.1 at MSJ Exhibit 42_9; R4, tab 12-405.1 at 1).  Accordingly, we hold that Chugach has not demonstrated that the government violated FAR 15.306(d).

Having determined that Chugach has not demonstrated that the government violated FAR 15.306(d), we need not reach the question of whether Chugach has demonstrated harm.

III.  Mutual Mistake

Chugach's next theory is that it and the Navy were mutually mistaken that the workload data contained in the solicitation could be "mapped to the current requirements" (app. br. at 155).  This is different from the statement in Chugach's complaint, and its claim, that the parties were mistaken in their belief that the contract could "be performed by a workforce of a similar size" to that of the existing contractor (compl. ¶ 143; R4, tab 4-1 at CFSI21902_45).  The government asserts that this is a "new claim" that was not presented to the contracting officer, and thus, that the Board is without jurisdiction to entertain it (gov't resp. at 64-65).

To determine whether two claims are the "same claim" for jurisdictional purposes, we look to see if they involve the same operative facts.  *Macro-Z Tech.*, ASBCA No. 60592, 19-1 BCA ¶ 37,358 at 181,659.  Put another way, "[t]he test for what constitutes a 'new' claim is whether 'claims are based on a common or related set of operative facts.'"  *Unconventional Concepts, Inc.*, ASBCA Nos. 56065 et al., 10-1 BCA ¶ 34,340 at 169,591 (quoting *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)).  Adding facts or legal arguments does not create a different claim.  *K-Con Bldg. Systems, Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015).  "The introduction of additional facts which do not alter the nature of the original claim . . . or the assertion of a new legal theory of recovery, when based upon the same operative facts as included in the original claim, do not constitute new claims."  *Trepte Constr. Co. Inc.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86.  A claim is new when it "'present[s] a materially different factual or legal theory' of relief."  *Lee's Ford Dock, Inc. v. Sec'y of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017) (quoting *K-Con Bldg. Sys., Inc.*, 778 F.3d at 1006).  "Materially different claims 'will necessitate a focus on a different or unrelated set of operative facts.'"  *Id.* (quoting *Placeway Constr.*, 920 F.2d at 907).  Here, the operative facts for Chugach's statement of its claim in its rule 11 brief are EJB's performance data contained in the solicitation and the allegation that the parties shared an understanding of how the data "mapped" to the requirements of the solicitation.  Chugach does not define "mapping" in its brief.  While the term "mapping" has different meanings, we interpret Chugach's brief as using the mathematical definition, meaning to apply a function to the elements of its domain.  Put more simply, we interpret the statement as meaning that the parties shared a belief that bidders could take the EJB data from the solicitation and, through some unstated mathematical formulae, arrive at similar estimates of the number of employees required to perform the work in the solicitation.  Similarly, the operative facts of Chugach's statement of its claim in its complaint are EJB's performance data contained in the solicitation and the parties' belief that the contract could be performed by a workforce of a similar size.  Although the complaint and the rule 11 brief are worded differently, they are essentially the same theory because both versions essentially argue that the parties believed that Chugach could perform with its

59

proposed staffing.  Accordingly, we deny the government's motion to dismiss Count III.

Turning to the merits of Count III, for a party to recover under the mutual mistake theory it must demonstrate:

(1) the parties to the contract were mistaken in their belief regarding a fact;
(2) that mistaken belief constituted a basic assumption underlying the contract;
(3) the mistake had a material effect on the bargain; and
(4) the contract did not put the risk of the mistake on the party seeking reformation.

*National Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006) (*citing Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990)).  Chugach has not established the existence of a mutual mistake.

Chugach contends that the parties were mistaken in their belief that "the volume and type of trouble calls in the solicitation data . . . aligned with the volume and type of trouble calls for the WSBOS contract" (app. br. at 156).  Chugach cites to the Navy's reliance on historical data to prepare the IGE as evidence that the Navy shared in this belief (*id*.).  The Navy counters that Chugach is alleging that the parties "were mistaken about a prediction of the future, not about a fact existing in the present" (gov't resp. at 66).  Under the appropriate standard of review, we denied the government's motion to dismiss Chugach's mutual mistake count.  *Chugach III*, 19- 1 BCA ¶ 37, 380 at 181,719.  Pursuant to Rule 11, we are permitted to make findings of fact based upon the record, and we find that Chugach's theory of recovery asserts a mistake of judgment and not a fact in existence.  Accordingly we find that Chugach cannot establish the existence of a mutual mistake.  *Kellogg Brown & Root Servs., Inc.*, ASBCA Nos. 59385, 59744, 20-1 BCA ¶ 37,656 at 182,830 ("Assumptions about future facts cannot establish a mutual mistake claim.") (citing *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202-03 (Fed. Cir. 1994).  Additionally, the fixed price contract explicitly placed the risk of the alleged mistake on Chugach.  The contract provides that the "Contractor shall perform all required repairs below the stated liability limits, regardless of the volume of work, with no additional cost to the Government (R4, tab 1-14.2 at GOV17267).  Chugach contends that, just because the contract is a fixed price contract, it doesn't prohibit a finding of mutual mistake (app. reply at 93).  Chugach also makes the unpersuasive argument that "[b]y providing the historical data and directing offerors to use that data to develop their proposals, the Navy intended to bear the risk of the mistake" (*id*.).  Here, the contract clause quoted above specifically assigns the very risk that Chugach complains of to Chugach.  We deny count III of Chugach's complaint.

IV. Constructive Change

Chugach additionally asserts a constructive change claim. For a contractor to recover under a constructive change theory, it must demonstrate: 1) that it performed work beyond the requirements of the contract; and 2) that the additional work was ordered by the government. *See, e.g.*, *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014). Here, Chugach does not identify any tasks that it performed that were beyond the requirements of the contract. Rather, Chugach asserts that its proposed staffing levels were incorporated into the contract, and that the Navy required it to perform work requiring a larger staff than contained in its proposal (app. br. at 158-63). Chugach also alleges that the Navy's purported negligent negotiations and withholding of superior knowledge can establish the government's fault and result in a constructive change (app. br. at 163). As we have already determined that the government did not engage in negligent negotiations or withhold superior knowledge we can reject this argument without further analysis.

Turning to Chugach's primary argument, we first review the language of the contract. Chugach relies upon the performance work statement of the solicitation provision, which states that "[t]he proposal presented by the offeror to whom the award is made will be incorporated, in whole or in part, into the contract at time of award" (R4, tab 3-1 at GOV18537), as providing that Chugach's proposal was incorporated in its entirety, including its proposed staffing levels (app. br. at 104, 159). However, Chugach cites selectively from the performance work statement. The contractual provision provides, in full, that:

> All terms and conditions of the contract award, performance work statement, and all attachments are applicable. The proposal presented by the offeror to whom the award is made will be incorporated, in whole or in part, into the contract at time of award. If the Contractor's proposal contains terms or conditions more favorable to the Government, these more favorable terms and conditions shall be performed. *However, the minimum requirements of the performance work statement must be met.*

(R4, tab 3-1 at GOV18537) (emphasis added) Moreover, the solicitation's "List of Documents, Exhibits and Other Attachments" includes a number of documents to be incorporated into the contract, but the list does not include attachment J.M-5 (the FTE worksheet) (*id*. at GOV18586). Interpreting the contract as a whole, we find that, to the extent Chugach's proposal was incorporated into the contract, the full time equivalent staffing worksheet does not relieve Chugach from meeting the performance

61

standards of the contract.  As stated in the solicitation, "the minimum requirements of the performance work statement must be met" (*id*. at GOV18537).

Chugach relies upon the contract's order of precedence clause to argue that its obligations pursuant to the contract were limited to the work it was capable of performing with its proposed staffing levels (app. br. at 160-61).  As noted above, the staffing worksheet is not an attachment expressly incorporated into the contact, thus the order of precedence clause is irrelevant.  Even if the staffing worksheet were incorporated into the contract, Chugach's proposed interpretation of the attachment as limiting the work required pursuant to the terms of the contract would only apply to the extent that there was an inconsistency between contract documents.  However, Chugach has not identified a conflict between its staffing proposal and the express provision that "the minimum requirements of the performance work statement must be met" (R4, tab 3-1 at GOV18537).  Chugach additionally cites to deposition testimony of a retired contracting officer as evidence that Chugach's proposal was incorporated into the contract (app. reply at 95-96).  However, interpretation of the terms of the contract is the province of the Board and the deposition testimony of retired government workers is not probative.  Similarly, Chugach's citation of parol evidence such as comments on the draft of the solicitation, comments by the technical evaluation team regarding proposals submitted by various offerors, negotiations with offerors, a purported "agreement on staffing levels," and comments supporting the contract award decision (app. reply at 96-99) are irrelevant where, as here, the solicitation is not ambiguous.

Chugach also fails to establish that the Navy directed it to perform work beyond the contract requirements.  At most, Chugach demonstrates that the Navy encouraged Chugach to meet the terms of the contract.  Chugach contends that it was not a volunteer and that the Navy pressured it to increase staffing beyond the levels contained in its proposal (app. br. at 162-63).  However, as held above, Chugach's proposed staffing levels were not incorporated into the contract and Chugach was required to satisfy the minimum requirements of the contract's performance work statement.  To the extent the government "pressured" Chugach to satisfy the minimum requirements of the contract's performance work statement, this did not constitute a constructive change to the contract.  In fact, the evidence of record demonstrates that it was Chugach, and not the Navy, that made the decisions to increase staffing levels (R4, tab 5-5 at 77-78; tab 5-2 at 81).

V.  Improper Withholding of Payment

The final count of Chugach's complaint seeks return of payments withheld by the government.  In the WBOS contract, the government retained payments for specific tasks that Chugach failed to perform.  Specifically, in a November 14, 2015 decision, the administrative contracting officer withheld $450,580.83 for certain

62

identified preventative maintenance tasks that Chugach failed to perform, and two positions that Chugach had not staffed (app. supp. R4, tab 1414 at CSUP 49777-78). For these items, the Navy estimated the value of the work pursuant to 5252.242-9304 by estimating the number of hours Chugach would have incurred to fill the vacant positions and perform the work (*see* app. supp. R4, tab 1416.01 at CSUP 49832-33). Chugach does not challenge this withholding, except to the extent that it prevails in one of its other theories and demonstrates that it performed additional work not required by the contract (app. reply at 104).  As we denied counts I through IV of Chugach's complaint, we hold that the government is entitled to the amounts specifically identified and withheld.  The November 14, 2015 decision also indicated that the Navy would make temporary withholdings of 10% of the total contract amount, with the withholding to become permanent at the end of the fiscal year (app. supp. R4, tab 1416.01 at CSUP49833).  The Navy subsequently reduced the percentage of withholding to 5 %, and released 40% of the prior withholdings (R4, tab 11-6 at GOV1723225_3).[8]

Chugach challenges this withholding for two reasons.  First, Chugach contends that the contract does not provide the government with the ability to withhold a fixed percentage of the contract (app. br. at 164-65).  Second, Chugach contends that the government is not entitled to retainage because the government caused Chugach's inability to meet the contract requirements (app. br. 165).  Chugach drops this second argument in its reply brief, and asserts that the government failed to establish the propriety or amount of its withholdings (app. reply at 109-14).

Turning to Chugach's first argument, we find that the contract does not prohibit the Navy from retaining funds based on a percentage of contact value.  Contract clause 5252.242-9304 provides in relevant part:

> In the event the price of non-performed or unsatisfactory work cannot be determined from the prices set out in the Schedule or on the basis of the actual cost to the Government, estimating methods may be used to determine an amount, which reflects the reduced value of services performed.  The Government may estimate the cost using wage rates and fringe benefits included in the wage determinations included in the contract, Government estimates of the Contractor's overhead and profit rates, and Government estimates of material costs if applicable.

---

[8] It is not clear from the document whether the 40% release applied to the $450,580.83 or just to the 10% retainage (R4, tab 11-6 at GOV1723225_3).

(R4, tab 3-1 at GOV18542) Chugach interprets the clause as limiting the government's ability to determine the value of the non-performed or unsatisfactory work to estimates of wage rates, overhead, profit, and material costs (app. reply at 107-08). Chugach cites to various rules of contract interpretation, such as specific language qualifying general language, *expression unius est exclusion alterius*, an interpretation giving meaning to all parts being preferable to one that renders another part superfluous, and the rule of *contra proferentem* (app. reply at 108-09). However, all of Chugach's arguments ignore the language of the clause providing that "estimating methods may be used" to estimate the costs (R4, tab 3-1 at GOV18542). In a separate sentence, the provision states that the government "may use" certain specified estimating techniques "if applicable" (*id*.). The contractual language providing that the government "may estimate" the costs in the specified manner, if applicable, does not limit government to estimating costs solely in that manner.

As we have denied Counts I through IV of Chugach's complaint, we similarly find that Chugach had not demonstrated that the government was responsible for Chugach's failure to perform under the contract. This leaves only Chugach's argument in its reply brief that the Navy failed to establish the propriety or amount of its withholdings. As an initial matter, we must consider whether Chugach's argument, raised in its reply brief, is timely. As a general rule, arguments raised for the first time in a reply brief are waived. *See, e.g.*, *Buck Town Contractors & Co.*, ASBCA No. 60939, 18-1 BCA ¶ 36,951 at 180,059. However, here, the retainage is a government claim, and the government bears the burden of proof. The government submitted declaration testimony to support its retainage as part of its post-hearing response brief. Thus, Chugach's reply brief was its first opportunity to respond to the government's new evidence. The government subsequently requested, and was permitted to file, a sur-reply brief. Thus, we find that consideration of Chugach's argument from its reply brief does not prejudice the government.

As we noted in *Aegis Defense Services, LLC, d/b/a GardaWorld Fed. Servs.*, ASBCA No. 62442 *et al.*, 22-1 BCA 38,099 at 185,029, the amount of a reduction in contract amount is a matter of quantum, but the government must demonstrate harm in the entitlement phase. In *Aegis*, the government asserted a diminution in value. Here the Navy asserts that work was not performed or was performed late. However, the Navy never identifies the work that it contends was not performed or was performed late.

The Navy submitted a number of proposed factual findings relating to its withholding of contractual amounts (*see* Navy Proposed Findings of Fact ¶¶ 375-84). The only costs specifically identified in the factual findings pertain to the deductive modification that Chugach is not challenging (*see* Navy Proposed Findings ¶¶ 376,

383).  At best, the Navy relies upon the declaration of the former Contracting Officer's Representative that:

> CFSI did fail to perform some work in accordance with the contract requirements, including the scheduled PM work based on the EJB work plans.  The result was a large backlog of PM work orders that CFSI failed to complete in a timely manner.  CFSI also failed to perform trouble calls in a timely manner and to staff some of the key personnel positions (e.g., Electrical Supervisor and Utilities Manager), for periods of time in FY15 and FY16.  NAVFAC estimated the cost of the FY16 non-performed work as 5% of the contract value of the recurring work.

(Gov't ex. 1 ¶ 20)  This conclusory statement is unsupported by citation to any workpapers or documentation of non-performed work.  Moreover, Mr. Sandoval does not state that he personally estimated the value of the non-performed, but just that "NAVFAC" estimated the cost without identifying the individual or individuals that purportedly estimated the value to be 5 percent (*id.*).

The Navy additionally cites to its performance evaluations and Chugach's responses (gov't ex. 8 at CFSI161578_1-2; R4, tab 11-2 at GOV172310_2; R4, tab 11-4 at GOV172317_2-3; R4, tab 11-6 at GOV172325_3; app. supp. R4, tab 1428 at CSUP49928-29).  These documents demonstrate that there was a backlog of work that Chugach had not performed timely.  However, contract clause 5252.242-9304 applies when work cannot be reperformed.  The clause also permits the government to require performance and to pay the contract amount.  Here, the government cites to a March 29, 2016 email from Chugach's Robert Haunton with the subject line "Backlog Reduction.xlsx" as evidence that Chugach had not performed the work required by the contract (gov't resp. at 82; gov't proposed finding of fact ¶ 385 (citing gov't ex. 8 at CFSI161578_1-2)).  However, the cited document, and the attachment provided by Chugach (app. ex. 17) also demonstrate that Chugach was increasing its staffing levels to reduce the backlog, implying that the work was being performed, albeit late.  Thus, we hold that the government has not demonstrated by a preponderance of the evidence that Chugach failed to perform contractual work, and therefore, is not entitled to a 5% withholding of the contract amount.

CONCLUSION

For the reasons stated above, Chugach's appeal is denied with regard to Counts I, II, III, and IV.  Chugach's appeal with regard to Count VI,  pertaining to the 5% withholding, is granted and remanded to the parties to determine quantum.

Dated:  June 8, 2023

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61320, Appeal of Chugach Federal Solutions, Inc., rendered in conformance with the Board's Charter.

Dated:  June 9, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals